367 S.E.2d 751

**A. Wayne GRAY d/b/a
Bob Gray Studios**

v.

**MARSHALL COUNTY BOARD
OF EDUCATION, et al.**

No. 18136.

Supreme Court of Appeals of
West Virginia.

March 10, 1988.

David R. Gold, Gold, Khourey and Turak, Moundsville, for A. Wayne Gray, d/b/a Bob Gray Studios.

John B. Garden, Bachmann, Hess, Bachmann & Garden, Wheeling, Thomas E. White, P.A., Moundsville, for Marshall CBE and Ronald Trowbridge.

NEELY, Justice:

A. Wayne Gray, the plaintiff below, is a professional photographer in Cameron, West Virginia. The defendant below, Ronald Trowbridge, is the principal of Cameron High School. Mr. Gray sued Mr. Trowbridge and the Marshall County Board of Education for conspiring to interfere with his business and a Marshall County Circuit Court jury awarded him $47,000 in actual damages.[1]

The case was submitted to the jury on the single issue of whether the actions of the defendants, Mr. Trowbridge and the Marshall County Board of Education, violated *W. Va. Code*, 47–18–3(a) [1978] which provides:

> Every contract, combination in the form of trust or otherwise, or conspiracy in restrain [sic] of trade or commerce in the State shall be unlawful.

Because *W. Va. Code*, 47–18–9 [1978] provides treble damages in antitrust suits, the circuit court entered judgment for $141,000, or three times the jury's $47,000 award. Thereafter, the defendants moved for a new trial on the grounds that the plaintiff had not proved an actionable conspiracy. The circuit court granted the motion and Mr. Gray appealed. The sole issue before us now is whether at trial Mr. Gray proved a conspiracy in restraint of trade that violated the West Virginia antitrust laws. We find that the plaintiff did not prove such a conspiracy, and we affirm the judgment of the circuit court.

I

In 1976 Mr. Gray returned to his hometown of Cameron and opened up an independent photography studio. At that time he was advised that Cameron High School was dissatisfied with its photographer and was looking for a replacement. Mr. Gray interviewed for the job and was offered a written contract by the board of education.

Apparently the duties of a school photographer differ from school to school, but the essential elements of the position are that the photographer provides underclass pictures and pictures of school activities for the yearbook for which he receives little or no compensation. In return, however, he is placed in a favorable position to take senior portraits, photographs of individual students who are involved in school activities, and dance pictures—all of which produce handsome profits. If the photographer is operating under an "exclusive" arrangement, other photographers are precluded from competing for the profitable business.

After Mr. Gray embarked upon the performance of his duties as school photographer for Cameron High School he found many of the provisions of his contract burdensome. One provision called for him to "rebate" 25 percent of the price of his pictures to the school. The rebate system was open and aboveboard, and there is no question that the money went to the school. Nonetheless, Mr. Gray found that the profit margin on underclass pictures was so small that he was required to charge considerably more than the pictures were worth in order to break even.

Much to Mr. Gray's credit, he also recognized that many parents in the community could not afford to pay for underclass pictures in light of their high cost—a problem related to the rebate requirement. Consequently, Mr. Gray began to give away underclass pictures to students who were indigent. Furthermore, Mr. Gray decided never again to accept a contract that re-

---

1. Initially, Mr. Gray's suit stated four separate causes of action. A cause of action for breach of fiduciary duty and another for entering into contracts before the beginning of a fiscal year were both abandoned. A third cause of action for secret rebates under the *W. Va. Unfair Trade Practice Act* was dismissed by the court at the conclusion of all the evidence, and that ruling is not appealed.

quired a rebate to the school. The decision by Mr. Gray to give pictures away was not to the school's liking because giving pictures away cut into the school's percentage. Consequently, relations between Mr. Gray and the school's new principal, Ronald Trowbridge, began to deteriorate.

After one year as official school photographer, Mr. Gray was replaced by Gruber Studios. Gruber Studios had an exclusive contract that precluded Mr. Gray from taking pictures on school premises or pictures related to school activities, even though students or faculty might request him to do so. However, Mr. Gray's overwhelming popularity with the students required Mr. Trowbridge to go beyond simple denial of access to school property if Gruber Studios' "exclusive" contract was to be of any value to Gruber Studios. Accordingly, Mr. Trowbridge threatened to expel students from school activities if they patronized Mr. Gray's studio while wearing a school activity uniform.[2] Mr. Trowbridge informed the students that they would be excluded from senior dances if Mr. Gray photographed them either before or after a school dance. Thus, Mr. Trowbridge's efforts to give meaning to the exclusivity clause of Gruber Studios' contract denied Mr. Gray three lucrative photographic opportunities: (1) school activity pictures, (2) athletic pictures, and (3) dance pictures.

In addition to specific policies denying Mr. Gray direct access to school business, Mr. Trowbridge also engaged in general harassment. Yearbooks that Mr. Gray had lent the school mysteriously disappeared; darkroom equipment that Mr. Gray had lent to the school was not readily returned; and, an article appeared in the Cameron High School yearbook indicating that Mr. Gray's pictures were twice as expensive as they actually were.

Eventually, there was even an effort to change a longstanding policy allowing any senior portrait that met the specifications of the yearbook advisor to be included in the Cameron High School yearbook. In 1984 Mr. Gray's only child was a senior at Cameron High School and, by that time, the appellant was so popular that he took approximately 80 percent of all the senior portraits. That year, however, Mr. Trowbridge and the yearbook advisor began to require that all high school senior portraits be taken by the official school photographer.

In summary, then, the jury could have concluded from the evidence at trial that there was a personal vendetta on the part of Mr. Trowbridge against Mr. Gray. Furthermore, there is ample evidence that as a result of Mr. Trowbridge's actions Mr. Gray lost substantial money.

II

There is little question that the plaintiff proved to the jury's satisfaction that he was unfairly treated by Mr. Trowbridge. However, Mr. Gray did not demonstrate the existence of a *conspiracy* between Mr. Trowbridge and the Marshall County Board of Education to injure Mr. Gray in his trade or business that would be actionable under the antitrust laws. This failure of proof involves two distinct aspects: First, the evidence in the record, including an admission requested by Mr. Gray, demonstrates that Mr. Trowbridge's policies with regard to Mr. Gray were not approved, condoned, or encouraged by the superintendent of schools or his direct subordinates. Second, the West Virginia antitrust laws prohibit conspiracies between separate economic actors. Mr. Trowbridge was an employee and agent of the Marshall County Board of Education; thus, to the extent that there was malicious conduct directed against Mr. Gray, it was the action of one entity—namely the board of education—and not the action of two entities conspiring with one another.

A.

The explicit disapproval of Mr. Trowbridge's conduct by the superintendent's office is exemplified by the facts surround-

**2.** Students testified that band members would be required to turn in their uniforms if Mr. Gray photographed them in uniform and that athletes would be dropped from teams if Mr. Gray took their athletic pictures.

ing attempts to prevent seniors from using Mr. Gray's pictures in the yearbook. Attempts to change the "open yearbook" policy regarding senior pictures first occurred in the 1979–1980 school year. One day Mr. Gray was called by a school coach to come to the school to take a team picture. Mr. Trowbridge, however, barred Mr. Gray's access to the school. Coincidentally, Mr. Robert Eaton, assistant superintendent of schools, happened to be at Cameron High School the day Mr. Gray was barred from the premises and the incident provided an opportunity for Mr. Gray to discuss his overall predicament with the assistant superintendent.

Mr. Gray explained to Mr. Eaton that the yearbook would no longer accept pictures taken by him, and asked why his senior pictures were excluded from the Cameron High School yearbook although they were included in the John Marshall High School yearbook. After Mr. Eaton spoke with the principal of John Marshall High School and confirmed that the appellant's photographs were, in fact, appearing in other school yearbooks within the county, the superintendent's office changed the Cameron High School policy to allow the appellant's photographs to appear in the Cameron High School yearbook.

Following this reinstatement of the old "open yearbook" policy, the appellant was again permitted to compete for senior pictures, and captured approximately 80 percent of the senior picture market at Cameron High School. The "open yearbook" policy ran smoothly from 1979 until 1983 when Mr. Trowbridge made another effort to change it.

Immediately before the summer recess of 1983, Mr. Trowbridge met with the junior class and yearbook advisor to distribute the specifications for senior pictures and to discuss other matters involving the class of 1984. Mr. Trowbridge advised the students that the school had received a letter from the yearbook company suggesting that students patronize a single photographer in order to obtain more uniform head sizes. The principal also explained that Gruber Studios, the school photog-

rapher, had agreed to take all senior pictures for a $10.95 sitting fee, per student, and then to donate a trophy case that the senior class had indicated it wanted to present to the school. Mr. Trowbridge explained that this procedure would save the senior class money on the trophy case and asked if students were willing to consider this policy. According to Mr. Trowbridge, an advisory vote was then taken.

According to other trial testimony, however, there was nothing "advisory" about the vote, and both students and parents believed that the vote was binding. One witness testified that although she wanted Mr. Gray to take her son's portrait, she went to Gruber Studios because she could not pay two sitting fees and she thought that Mr. Trowbridge had reinstated the "closed yearbook" policy.

When Mr. Gray received word of the "advisory" vote he once more contacted assistant superintendent Robert Eaton about Mr. Trowbridge's efforts to exclude him from the senior portrait business. Mr. Gray testified that he was promised by Mr. Eaton that he would direct Mr. Trowbridge to advise the students at Cameron, before leaving for the summer, that they could patronize any photographer that they wished. In this regard Mr. Gray requested and received the following admission:

> The defendant, Ronald Trowbridge, was ordered by assistant superintendent Eaton to advise the seniors of Cameron High School prior to the close of 1983 school year that they could patronize any photographer that they wished.

Another admission provided:

> Defendant, Ronald Trowbridge, had never advised the seniors at Cameron High School prior to the expiration of the 1983 school year that they could patronize any photographer that they wished.

Furthermore, Mr. Gray's brief in this Court *specifically points out* that Mr. Trowbridge refused to follow direct orders by his superiors at the Marshall County Board of Education to reinstate an open yearbook policy and to treat Mr. Gray more fairly.

### B.

From the law's point of view, it must be remembered that the gravamen of a *W. Va. Code,* 47–18–3(a) [1978] antitrust violation is a *conspiracy.* The severe punitive damages provisions of the antitrust laws—authorizing, as they do, treble damages—are designed to punish an intentional agreement by two or more economic entities to injure another economic entity. *United States v. Cooper Corporation,* 312 U.S. 600, at 607–608, 61 S.Ct. 742, at 745, 85 L.Ed. 1071 (1941); *Fortner Enterprises v. United States Steel Corp.,* 394 U.S. 495, at 502, 89 S.Ct. 1252, at 1258, 22 L.Ed.2d 495 (1969); *Hawaii v. Standard Oil Co.,* 405 U.S. 251, at 262, 92 S.Ct. 885, at 891, 31 L.Ed.2d 184 (1972); *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1976). There would be no equity, therefore, in the case before us, to allow a treble damages judgment against the board of education because there was a concerted effort by the senior executives serving that board to thwart Mr. Trowbridge. Thus, as a matter of fact, Mr. Gray's fight is with Mr. Trowbridge as an individual—acting, perhaps, in an unauthorized way in the course of his employment—and not with the board.

### III

■ *W. Va. Code,* 47–18–16 [1978] provides that the West Virginia antitrust statutes "shall be construed liberally and in harmony with ruling judicial interpretations of comparable federal anti-trust statutes." There are few antitrust decisions by this Court; however, *W. Va. Code,* 47–18–3(a) [1978] contains the same language as Section 1 of the federal Sherman Act, 15 U.S.C. § 1. Consequently, we are directed by the legislature to apply the federal decisional law interpreting the Sherman Act to our own parallel anti-trust statute, *Code,* 47–18–3(a) [1978].

■ A corporation, as a single business entity, acts with one "mind" and the unilateral acts of a corporation will not satisfy the requirement of a "contract, combination in the form of trust or otherwise, or conspiracy." *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). Because a corporation acts only through its officers, agents, and employees, a contract, combination, or conspiracy involving the corporation and its employees will not satisfy the concerted action requirement of Section 1 of the Sherman Act. *Harvey v. Fearless Farris Wholesale, Inc.,* 589 F.2d 451, 455 n. 7 (9th Cir.1979).[3]

Litigants have attempted to escape the concerted action requirement of the antitrust laws by urging the adoption of a theory now known as the "Intra–Enterprise Conspiracy Doctrine." Under this doctrine, a court could find a conspiracy

---

**3.** In *Copperweld, supra,* the U.S. Supreme Court, notwithstanding some infelicitous language of its previous opinions, finally agreed with the overwhelming weight of authority in the lower courts that intracorporate agreements are immune from attack as Section 1 conspiracies. The lower federal courts uniformly agree that officers and employees of a single firm are *legally incapable* of conspiring among themselves or with their firm exclusively to advance the interests of that firm, in violation of Section 1 of the Sherman Act 15 U.S.C. § 1 (1976), *see, e.g., Tose v. First Pennsylvania Bank,* 648 F.2d 879, 893–894 (3d Cir.1981) (corporation and officers), *cert. denied,* 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981). *Card v. National Life Ins. Co.,* 603 F.2d 828, 834 (10th Cir.1979) (corporation and sales agents); *H & B Equip. Co. v. International Harvester Co.,* 577 F.2d 239, 244 (5th Cir.1978) (corporation and manager of company-owned store); *Walker v. Providence Journal Co.,* 493 F.2d 82, 87 (1st Cir.1974) (corporation and employees); *Joseph E. Seagram & Sons v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71, 82–84 (9th Cir.1969) (three unincorporated divisions of a single corporation), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970).

A rule that intracorporate agreements are immune from attack as Section 1 conspiracies is consistent with the purposes of Section 1 and with antitrust goals in general. All internal firm decisions can, in some sense, restrain trade. The purpose of Section 1, however, is not to proscribe all agreements restraining trade but instead to prohibit collaboration by independent business entities that inhibits competition. *See United States v. Citizens & Nat'l Bank,* 422 U.S. 86, 116, 95 S.Ct. 2099, 2116–17, 45 L.Ed.2d 41 (1975); *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); McQuade, "Conspiracy, Multicorporate Enterprise, and Section 1 of the Sherman Act," 41 Va.L.Rev. 183, 185 (1955).

despite the presence of only a single corporate actor and its employees. However, notwithstanding some notable academic support, *see* note, "Conspiring Entities under Section 1 of the Sherman Act," 95 Harv.L.Rev., 661, 667–668 (1982), the Supreme Court roundly and explicitly rejected the intra-enterprise conspiracy doctrine in *Copperweld, supra.* The Supreme Court explained in *Copperweld* that the "doctrine derive[d] from declarations in several of [its] opinions," but that though discussed in those opinions, "the novel theory of intra-enterprise conspiracy was not necessary for a finding of substantive liability" in any of those cases. *Copperweld,* 467 U.S. at 766, 104 S.Ct. at 2739. *See also Intra–Enterprise Conspiracy under Section 1 of the Sherman Act; A Suggested Standard,* 75 Mich.L.R. 717 at 718 (1977).

The prior cases, summarized by the Supreme Court in *Copperweld,* 467 U.S. at 760–766, 104 S.Ct. at 2736–2739, contain sweeping language to the effect that a parent corporation and its subsidiary can "conspire" within the meaning of Section 1 of the Sherman Act. However, each of those cases also contained at least one alternative basis for finding liability. In *Copperweld,* a jury had found that Copperweld, and its wholly-owned subsidiary, Regal, conspired to violate Section 1 of the Sherman Act. The jury exonerated the only unrelated party from any antitrust violation. Despite serious misgivings, the Court of Appeals for the Seventh Circuit affirmed, *Independence Tube Corp. v. Copperweld Corp.,* 691 F.2d 310 (7th Cir. 1982), and so the Supreme Court was squarely confronted by the intra-enterprise conspiracy doctrine with no alternative basis for finding liability.

The Supreme Court reversed the Seventh Circuit and, in so doing, unequivocally repudiated the intra-enterprise conspiracy doctrine. The Court reviewed its earlier cases discussing the doctrine and concluded:

> In short, while this Court has previously seemed to acquiesce in the intra-enterprise conspiracy doctrine, it has never analyzed in detail the justifications for such a rule; the doctrine has played only a relatively minor role in the Court's Sherman Act holdings.

467 U.S. at 766, 104 S.Ct. at 2739. The Court then went on to hold that a corporation and its wholly-owned subsidiary can never conspire within the meaning of Section 1 of the Sherman Act, because they are not separate economic entities. Furthermore, to emphasize the point, the Supreme Court *overruled all prior holdings* to the contrary. Thus, regardless of any opinion that we might enjoy on the desirability of the intra-enterprise conspiracy doctrine, we are bound by *W. Va. Code,* 47–18–16 [1978] to follow the Supreme Court's holding in *Copperweld.*

## IV

■ Traditionally, a corporation cannot conspire with its employees. *Cook v. Hecks, Inc.,* 176 W.Va. 368, 342 S.E.2d 453, 460 (1986). Mr. Gray urges an exception when the employee has an "independent personal stake" in violating the antitrust laws. This exception may still exist in some instances when the agent or employee has an *independent financial motive* to injure a third party that is directly related to a trade or business in which the employee is engaged independent of his work with the corporation. *Greenville Publishing Co. v. Daily Reflector, Inc.,* 496 F.2d 391, 399–400 (4th Cir.1974); *Morton Bldgs. of Nebraska, Inc. v. Morton Bldgs., Inc.,* 531 F.2d 910, 917 (8th Cir.1976). Yet the Court of Appeals for the Sixth Circuit has rejected even this narrow use of intra-enterprise conspiracy theory. *Potters Medical Center v. City Hospital Association,* 800 F.2d 568, 573 (6th Cir.1986). Certainly, under no circumstances could a conspiracy be found if the management of the corporation actively resisted all efforts by a mere employee to subvert the power of the corporation to the conspiracy's purpose.

However, in the case before us we are not asked to apply the intra-enterprise conspiracy doctrine to a situation where Mr. Trowbridge had an *economic* interest in destroying Mr. Gray's business. Rather, Mr. Gray asks us to expand on the intra-enterprise conspiracy doctrine (in the face

of its repudiation elsewhere) to the point where it becomes a blunt weapon against outrageous conduct injuring another business by any corporate employee. Appellant's brief argues that the "personal stake or advantage that an individual may gain while engaging in a corporation conspiracy covers the spectrum of human emotion." If this proposition were accepted, simple spite would become actionable under the antitrust laws, which is a result that we find was not intended by the legislature.

■ The antitrust laws are not designed to deter all the evils known to modern commercial life; rather, they are designed to deter one specific evil—namely anti-competitive, conspiratorial *economic* behavior. "Concerted action between two or more distinct *economic* entities is an essential element of a Section 1 violation." *Belfiore v. N.Y. Times Co.*, 654 F.Supp. 842, 850 (D.Conn.1986) *affirmed* 827 F.2d 177 (1987), (petition for *certiorari* filed Dec. 29, 1987) (emphasis added). *See also Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025, 1031 (2d Cir.1979), *cert. denied*, 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172, (1979); *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704 (7th Cir. 1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980). *Monsanto Co. v. Spray Rite Service Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984); *H & B Equipment Co., v. International Harvester Co.*, 577 F.2d 239 (5th Cir.1978). As the Supreme Court said in *Copperweld, supra:*

> The officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals.... For these reasons, officers or employees of the same firm do not provide the plurality of actors imperative for a § 1 conspiracy.

467 U.S. at 769, 104 S.Ct. at 2740–41. Even courts that accept some part of the intra-enterprise conspiracy doctrine require that the employee have a financial or economic motive independent of that of his firm in order to fall within the doctrine.

Accordingly, for the reasons set forth above, the judgment of the Circuit Court of Marshall County is affirmed.

Affirmed.