690 S.E.2d 587

**PRINCETON INSURANCE AGENCY, INC. and Kevin Webb, Plaintiffs Below, Appellees**

v.

**ERIE INSURANCE COMPANY, Erie Insurance and Property Casualty Company, Erie Family Life Insurance Company, Erie Insurance Exchange, Erie Indemnity Company, Charles Michael Fletcher, and Carl Olian, II, Defendants Below, Appellants.**

No. 34498.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 8, 2009.

Decided Nov. 18, 2009.

W. Henry Jernigan, Dinsmore & Shohl, Charleston, WV, James D. Lamp, Matthew J. Perry, Lamp, O'Dell, Bartram, Levy & Trautwein, Huntington, WV, for the Appellants.

Anthony R. Veneri, Law Office of Anthony R. Veneri, Princeton, WV, for the Appellees, Princeton Insurance Agency and Kevin Webb.

Marc E. Williams, Huddleston Bolen, Huntington, WV, for Amicus Curiae Independent Insurance Agents.

Clarence E. Martin, Martin & Seibert, Martinsburg, WV, for Amicus Curiae WV Insurance Federation.

PER CURIAM:

Erie Insurance Company and its affiliated corporate and individual defendants [1] (herein collectively referred to as "Erie"), appeal from a partially adverse jury verdict in a case involving alleged violations of antitrust, unfair trade practices, and consumer protection laws. The underlying action was initiated by Appellees Princeton Insurance Agency ("Agency") and Kevin Webb after Erie terminated an independent insurance agency agreement with the Agency and Mr. Webb, pursuant to which Appellees were authorized to sell Erie's insurance products in West Virginia. The jury returned a verdict in favor of Erie on the consumer protection and unfair trade practices claims but found against it on the antitrust claims. In addition to arguing that this matter was wrongly permitted to proceed to trial based on Appellees' failure to demonstrate an antitrust claim, Erie argues that the trial court lacked jurisdiction over certain claims; that Appellees failed to allege or prove compensable antitrust injuries; that the trial court erred in ruling that the Erie corporate defendants could conspire with one another for antitrust purposes; and that the trial court wrongly permitted lost future commissions to be awarded as damages. Upon a thorough review of the record in this case, we conclude that Appellees failed to introduce sufficient evidence to demonstrate an antitrust injury. Accordingly, the decision of the trial court is reversed.

## I. Factual and Procedural Background

The Agency is a West Virginia corporation engaged in the business of marketing insurance products for multiple insurance companies. In connection with its operation as an independent insurance agency, the Agency entered into an agency agreement in West Virginia in the early 1990's with two members of the Erie Insurance Group:[2] Erie Insurance Property and Casualty and Erie Family Life. That contract was updated in 1999, when Kevin Webb became the responsible agent for the Agency.[3] In 2001, Kevin Webb executed a separate agency agreement with Erie in his own name as a licensed insurance agent in Virginia. Under this agreement, he was authorized to write automobile, homeowners, and general commercial insurance in Virginia on behalf of Erie Insurance Exchange and Erie Insurance Company. Kevin Webb also entered into an agency agreement in 2001 allowing him to write life insurance on behalf of Erie Family Life in Virginia. The Agency was not a party to any agreements that Kevin Webb entered into with Erie for purposes of writing business in Virginia.

In 2002, the Agency established a relationship with a newly-created insurance agency known as the Princeton Insurance Associates ("Insurance Associates"). The Agency permitted Insurance Associates to operate out of its Princeton, West Virginia, offices and to utilize its staff. A significant portion of the new agency's business resulted from the transfer by Rita Kidd, an Insurance Associates' stockholder, of her book of business with State Auto. While Insurance Associates sold insurance on behalf of multiple insurers, it did not sell any Erie insurance products.

Erie relates that shortly after the Agency and Insurance Associates undertook their business relationship, it began to experience a steep decline in both the profitability and quantity of the Erie insurance products that the Agency was underwriting. To illustrate, Erie introduced evidence at trial that by the end of 2003, personal automobile applications had declined by 73%; the number of commercial automobile policies had declined by 79%; and commercial property and casualty applications had declined by 78%. Based on these declines plus the Agency's purported losses of over 4.3 million dollars during the

---

**1.** Also named as defendants below were the following entities: Erie Insurance Property and Casualty Company; Erie Family Life Insurance Company; Erie Insurance Exchange; Erie Indemnity Company; Charles Michael Fletcher; and Carl Olian, II.

**2.** The Erie Insurance Group includes Erie Insurance Company, Erie Insurance Property and Casualty Company, Erie Family Life Insurance Company, Erie Insurance Exchange, and Erie Indemnity Company.

**3.** Initially, Kevin Webb's father, Frazier Webb, was the responsible agent under the agreement. The Agency is owned by Kevin and Frazier Webb.

preceding decade,[4] Erie began to examine whether it should continue its relationship with the Agency. Of additional concern, was Erie's hunch that the Agency was steering business to Insurance Associates.

In an attempt to discover whether the Agency was diverting business through its affiliation with Insurance Associates, Erie sought to obtain the production reports of Insurance Associates for sales of State Auto policies during May to September of 2003. This occurred through email communications sent by Erie employee Charles Fletcher[5] and a meeting between Mr. Fletcher and Kevin Webb that occurred on October 15, 2003, at a Princeton restaurant. While Mr. Webb did not produce the requested production reports during the restaurant meeting, he did scribble one production number relative to State Auto policies on a napkin that he tendered to Mr. Fletcher. Following this meeting, Mr. Fletcher left a voice mail on Kevin Webb's answering machine repeating his demand for the production reports. By letter dated November 5, 2003, Kevin Webb advised Erie that it would not be tendering the State Auto production reports.

By letter dated March 12, 2004, Erie terminated its contract with the Agency and with Mr. Webb, pursuant to a termination clause in the agency agreement that permitted either party to end the arrangement with ninety-days notice.[6] Appellees do not dispute that proper notice was given by Erie prior to the termination. They similarly do not contend that Erie failed to live up to its obligations under the agreement with regard to the payment of any commissions that were owed to Appellees. After the subject agreement was terminated, Erie continued to conduct business in the area through two other independent insurance agents. And the Agency continued to underwrite insurance products for State Auto, Zurich, SAFE, Progressive, Dairyland, Assured Health, and Blue Cross/Blue Shield.

Appellees instituted a cause of action against Erie, alleging that the agency agreement was terminated in violation of public policy; that Erie violated the West Virginia Unfair Trade Practices Act[7] by requesting confidential information; and that Erie violated the West Virginia Antitrust Act[8] by improperly restraining trade. As the public policy claim was dismissed by the trial court, the only claims that proceeded to trial were based on alleged violations of the Antitrust Act and statutory prohibitions against disclosing private consumer information.

The jury returned a defense verdict regarding Appellees' claim that Erie had disclosed private consumer information. The jury found, however, that Erie's termination of the agency agreement with Appellees was an unreasonable restraint of trade in viola-

---

4. This figure was represented at trial to be the losses experienced on all Erie insurance products sold by the Agency over the preceding ten-year period.

5. Mr. Fletcher was the branch manager of Erie's Parkersburg, West Virginia, office.

6. The letter, which set forth at length the reasons for the termination, included the following explanation:

> ERIE has experienced a number of recurring issues with respect to your Agency. It appears to ERIE that your Agency lacks an effective re-underwriting program, has experienced difficulty with a proper selection and underwriting of new business, has not developed a successful and effective business/marketing plan, has expended limited resources on the training of Agency staff members, has experienced numerous service complaints from your Agency's ERIE Policyholders, and, for many years, has suffered a very poor loss ratio. In 1997, your Agency was placed on a commis-

sion cut. I have been advised by your District Sales Manager that the foregoing issues have been a common theme with your Agency and continue to be of significant concern today.
> . . . .
> As an independent Agent, you are the owner of your ERIE expirations and can manage your Agency in *any* manner you deem appropriate. However, when the management of your Agency adversely affects the manner in which ERIE Policies are underwritten, re-underwritten, and serviced, then ERIE has no choice but to take those necessary steps to address the issue. ERIE has now closely reviewed its multi-year relationship with your Agency and has determined that, unfortunately, the mutual expectations held by your Agency and ERIE at the commencement of our Agency Agreement are simply not being fulfilled.

7. See W.Va.Code § 33-11-4(4) (2006).

8. See W.Va.Code § 47-18-3 (2006).

tion of state antitrust law. The jury awarded Appellees $1,411,209 in compensatory damages and the same amount in punitive damages. The trial court vacated the award of punitive damages but trebled the compensatory damage award, entering judgment against Erie in the amount of $4,233, 627. Through this appeal, Erie seeks relief from the trial court's decisions to deny its various motions for judgment as a matter of law,[9] arguing that Appellees failed to allege and demonstrate an antitrust injury.

## II. Standard of Review

■ Recognizing that the terminology change in 1998 from judgment notwithstanding the verdict to judgment as a matter of law necessitated a correspondent change to the applicable standard of review, we recently announced in syllabus point one of *Fredeking v. Tyler,* 224 W.Va. 1, 680 S.E.2d 16 (2009) that "[t]he appellate standard of review for an order granting or denying a renewed motion for a judgment as a matter of law after trial pursuant to Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998] is *de novo.*" As we explained earlier in *Gillingham v. Stephenson,* 209 W.Va. 741, 551 S.E.2d 663 (2001):

> We apply a *de novo* standard of review to the grant or denial of a pre-verdict or post-verdict motion for judgment as a matter of law. After considering the evidence in the light most favorable to the nonmovant party, we will sustain the granting or denial of a pre-verdict or post-verdict motion for judgment as a matter of law when only one reasonable conclusion as to the verdict can be reached. *See* Syl. Pt. 3, *Brannon v. Riffle,* 197 W.Va. 97, 475 S.E.2d 97 (1996).

209 W.Va. at 745, 551 S.E.2d at 667. With this standard in mind, we proceed to determine whether the trial court committed error in denying Erie's motion for judgment as a matter of law.

## III. Discussion

The core issue presented in this case is whether Erie's termination of the agency agreement it had with Appellees to sell insurance in West Virginia [10] constituted an antitrust violation. Throughout the pendency of this matter, Erie repeatedly asserted its position that the agreement's termination did not amount to a restraint of trade under well-settled principles of antitrust law. An examination of both the law and the facts of this case is required to determine if Appellees established an antitrust violation.

### A. Restraint on Trade

■ The provision of our state antitrust act [11] that Appellees sought recovery under was West Virginia Code § 47–18–3 (2006). Under that provision, "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in this State shall be unlawful." W.Va.Code § 47–18–3(a). In comparing this provision to its federal counterpart, we recently recognized that "[t]he primary distinction between W.Va.Code § 47–18–3(a) and Section 1 of the Sherman Act is that the West Virginia statute applies to contracts and conspiracies in restraint of trade 'in this State' while the federal statute is applicable to contracts and conspiracies 'in restraint of trade or commerce among the several States, or with foreign nations.'" *Kessel v. Monongalia County Gen. Hosp. Co.,* 220 W.Va. 602, 611, 648 S.E.2d 366, 375 (2007). The Legislature has directed that where our state antitrust provisions track the Sherman Act's provisions, federal decisional law should be followed. *See* W.Va.Code § 47–18–16; *accord* Syl. Pt. 2, *Gray v. Marshall County Bd. of Educ.,* 179 W.Va. 282, 367 S.E.2d 751 (1988)

9. In addition to appealing from the trial court's failure to grant it judgment as a matter of law post-trial, Erie appeals from the trial court's failure to dismiss Appellees' antitrust claims for failure to state a claim under the WV Antitrust Act; the trial court's failure to grant it summary judgment with respect to the antitrust claims; and the trial court's failure to grant it judgment at the close of Appellees' case in chief and at the conclusion of all the evidence.

10. While there were two additional agency agreements between Erie and Mr. Webb, both of those agreements pertained to the sale of insurance in Virginia. We do not address those agreements, believing that any issue as to alleged violations of antitrust law arising under those agreements would be governed by Virginia law.

11. *See* W.Va.Code §§ 47–18–1 to –23 (2006).

("The courts of this state are directed by the legislature in *W.Va.Code*, 47–18–16 [1978] to apply the federal decisional law interpreting the Sherman Act, 15 U.S.C. § 1, to our own parallel antitrust statute, *W.Va.Code* § 47–18–3(a) [1978]"). As a result, we look to federal law to define what constitutes an unlawful restraint of trade.

 To establish a restraint of trade in violation of section 1 of the Sherman Act ("section 1"), a plaintiff must prove "(1) concerted action by the defendants; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action." *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 639 (3rd Cir.1996).[12] As the Third Circuit explained in *Mathews*, the triggering event for liability under section 1 is an agreement that entails a "unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement." 87 F.3d at 639 (omitting internal citations). Critically, a section 1 violation does not result if the action taken was unilateral, regardless of the motivation. *See Mathews*, 87 F.3d at 639; *accord Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 702 (4th Cir.1991).

### 1. Concerted Action

 As the Fourth Circuit articulated in *Oksanen*, "[p]roof of concerted action requires evidence of a relationship between at least two legally distinct persons or entities." *Id.* at 702. At issue in *Oksanen* was whether the medical staff and the hospital were distinct entities for purposes of antitrust analysis. In concluding that the medical staff acted as the hospital's agent during the peer review process and therefore was legally in-

distinct from the hospital,[13] the Fourth Circuit relied upon the United States Supreme Court's adoption of the principle of intracorporate immunity in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). Explaining this principle, the Fourth Circuit observed:

> *Copperweld* established that the unilateral actions of a single enterprise are immune from the coverage of section one despite any corresponding restraint on trade. As an example of unilateral conduct, the Court pointed to agreements among corporate officers. "The officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals." Applying that reasoning, the Court held that agreements between a parent corporation and its wholly owned subsidiary are not concerted actions for purposes of section one. The Court noted that a parent and its subsidiary always have a unity of interest so the law's concern with a sudden joining of independent interests is not present in such a case.

*Oksanen*, 945 F.2d at 703 (citations omitted).

Of critical importance in *Copperweld* was the Supreme Court's recognition that the form of an enterprise's structure is not the cynosure to antitrust liability.[14] Stressing the need to look beyond the corporate structure to the underlying realities, the Supreme Court articulated:

> Antitrust liability should not depend on whether a corporate subunit is organized as an unincorporated division or a wholly owned subsidiary. A corporation has complete power to maintain a wholly owned

---

**12.** The Fourth Circuit states the elements necessary to prove a section 1 violation as: "(1) a contract, combination or conspiracy; (2) that imposed an unreasonable restraint of trade." *Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir.2002).

**13.** The Fourth Circuit did explain, however, that because "a medical staff can be comprised of physicians with independent and at times competing economic interests," members of a medical staff do have the capacity to conspire as a

matter of law. *Oksanen*, 945 F.2d at 706. Even so, this "does not mean ... that every action taken by the staff satisfies the contract, combination, or conspiracy requirement of section one." *Id.* at 706.

**14.** As the Court observed, "[t]he purposeful choice of a parent corporation to organize a subunit as a subsidiary is not itself a reason to heighten antitrust scrutiny, because it is not laden with anticompetitive risk." *Copperweld*, 467 U.S. at 772 n. 19, 104 S.Ct. 2731.

subsidiary in either form. *The economic, legal, or other considerations that lead corporate management to choose one structure over the other are not relevant to whether the enterprise's conduct seriously threatens competition....* [A] corporation may adopt the subsidiary form of organization for valid management and related purposes. Separate incorporation may improve management, avoid special tax problems arising from multistate operations, or serve other legitimate interests. Especially in view of the increasing complexity of corporate operations, a business enterprise should be free to structure itself in ways that serve efficiency of control, economy of operations, and other factors dictated by business judgment without increasing its exposure to antitrust liability. [T]here is nothing inherently anticompetitive about a corporation's decision to create a subsidiary....

*Copperweld,* 467 U.S. at 772–73, 104 S.Ct. 2731 (emphasis supplied). Underscoring this point, the Court remarked: "[i]f antitrust liability turned on the garb in which a corporate subunit was clothed, parent corporations would be encouraged to convert subsidiaries into unincorporated divisions." *Id.* at 773, 104 S.Ct. 2731.

Because the ruling in *Copperweld* was limited to determining that a corporation and its wholly-owned subsidiary cannot conspire for purposes of the concerted action requirement of section one,[15] a degree of uncertainty concerning its application to cases that involve non-wholly owned subsidiaries remains. *See Fraser v. Major League Soccer, LLC,* 284 F.3d 47, 56 (1st Cir.2002) (stating that "what the Supreme Court has never decided is how far *Copperweld* applies to more complex entities and arrangements that involve a high degree of corporate and economic integration but less than that existing in *Copperweld* itself"). When presented with cases in which there is less than 100% control over a subsidiary, federal courts have looked to the amount of control the parent company has over its subsidiary, examining, in view of the principles enunciated in *Copperweld,* whether there is a unity of purpose which essentially forecloses the risk of anticompetitive conspiracy. *See, e.g., Coast Cities Truck Sales v. Navistar Int'l Transportation Co.,* 912 F.Supp. 747, 765–66 (D.N.J.1995) (concluding that parent company's varying ownership of 70% to 100% of "subsidiary" dealcors' voting shares created unity of interest); *Bell Atlantic v. Hitachi Data Sys. Corp.,* 849 F.Supp. 702, 706–07 (N.D.Cal.1994) (finding parent corporation legally incapable of conspiring in violation of section 1 based on 80% ownership of subsidiary); *Rosen v. Hyundai Group (Korea),* 829 F.Supp. 41, 45 n. 6 (E.D.N.Y. 1993) (concluding that parent corporation's ownership of 80% of subsidiary's stock where one managing director owned additional 20% demonstrated complete unity of interest); *Novatel Commun., Inc. v. Cellular Tel. Supply, Inc.,* 1986 WL 798475 at *9 (N.D.Ga. 1986) (reasoning that 51% ownership by parent corporation of subsidiary's stock assured parent of full control over subsidiary, thereby precluding concerted action requirement of section 1); *see also American Chiropractic Ass'n v. Trigon Healthcare, Inc.,* 367 F.3d 212, 224 (4th Cir.2004) (relying on unity of interest analysis to view health care panel physicians as corporate agents incapable of conspiring with health insurance company).

Faced with allegations of concerted activity between a parent company and a non-wholly owned subsidiary,[16] the Court in *Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125 (3rd Cir.1995), framed the "fundamental question" presented in *Copperweld* as "whether an agreement between a parent and its wholly owned subsidiary represents the conduct of one economic actor or two." 54 F.3d at 1132. Reasoning that the Supreme Court had "encouraged the courts to analyze the substance, not the form, of economic arrangements," the Court determined in *Siegel Transfer* that the companies involved "were, in substance, one economic unit, incapable of an antitrust conspiracy un-

---

**15.** The Court observed in *Copperweld:* "We do not consider under what circumstances, if any, a parent may be liable for conspiring with an affiliated corporation it does not completely own." 467 U.S. at 767, 104 S.Ct. 2731.

**16.** In *Siegel Transfer,* the parent company owned 99.92% of the subsidiary's stock. *See* 54 F.3d at 1133.

der *Copperweld*." 54 F.3d at 1132–33. In an attempt to merge the reasoning of both *Copperweld* and *Siegel Transfer*, the following standard has been proposed where subsidiaries are not wholly owned:

> *Copperweld* and *Siegel Transfer* thus teach that § 1 of the Sherman Act focuses on concerted activity among otherwise independent actors. Courts examining the substance, rather than the form of the economic arrangement, may initially engage in a bright-line analysis of whether a subsidiary is wholly owned. However, if the subsidiary is not wholly owned, the court's inquiry does not end there. Instead, a court must next determine whether the parent and subsidiary are inextricably intertwined in the same corporate mission, are bound by the same interests which are affected by the same occurrences, and exist to accomplish essentially the same objectives. For example, a parent that does not wholly own a subsidiary but nevertheless asserts total dominion over its actions, by way of management control, contractual obligations, economic incentives, or otherwise, is probably incapable of conspiring with that subsidiary for purposes of § 1 of the Sherman Act.

*Coast Cities Truck Sales*, 912 F.Supp. at 765 (citation omitted).

Looking to the high court's analysis in *Copperweld*, Erie argues that its corporate structure precludes the element of concerted action required to establish a restraint of trade in violation of state antitrust law. The parent company of the Erie Insurance Group—Erie Indemnity—owns 100% of Erie Insurance Company and Erie Insurance Property and Casualty. With regard to Erie Family Life Insurance, Erie Indemnity owns 21.6% and Erie Insurance Exchange owns 53.5%.[17] Because Erie Indemnity is the attor-

ney-in-fact for the policyholders of the Erie Insurance Exchange, Erie maintains that Erie Indemnity has complete legal control over Erie Insurance Exchange.[18] *See Bell Atlantic*, 849 F.Supp. at 706 (reasoning that parent and subsidiary over which parent has legal control cannot conspire to restrain trade because they "share a unity of interest and common corporate consciousness"). Combining the 21.6% that Erie Indemnity owns with the 53.5% that Erie Insurance Exchange owns, Erie argues that its parent corporation effectively owns over 75% of the stock in Erie Family Life Insurance. To support its position that the parent company had a complete unity of interest with its subsidiaries and with the Erie Insurance Exchange, Erie cites to evidence adduced at trial demonstrating the wholly unified manner in which the various Erie companies were operated and controlled.

Both Mr. Webb and Mr. Fletcher testified at trial that Erie's various insurance products were grouped together for purposes of sales and management. The fact that Erie's insurance products are organized through separate subsidiaries did not translate into distinct treatment for sales purposes. The same insurance agent could sell, pursuant to applicable licensing laws and contractual agreement, any of Erie's products. In like manner, Erie's managers supervised the sales of all the various Erie products in a heterogeneous fashion.

In furtherance of its position that the Erie subsidiaries operated in a unified manner with a singular economic objective of promoting Erie products, Erie cites the fact that all of its corporate employees are employed by Erie Indemnity. None of its subsidiaries or the Erie Insurance Exchange have any employees. The issuance of a single letter to terminate sales by Appellees of all Erie in-

---

**17.** The remaining stock is owned by public shareholders and directors.

**18.** Erie Insurance Exchange is a Pennsylvania regulated reciprocal company. A reciprocal insurance exchange is an unincorporated entity whose members, referred to as either policyholders or subscribers, all own an interest in the company. No stock certificates are issued to the individual policyholders and the policyholders share in profits and losses proportionate to the

insurance they own. As the attorney-in-fact for the Exchange's policyholders, Erie Indemnity is charged with the managerial responsibility for its operations, which includes paying losses experienced by the exchange, investing premium inflow into the exchange, recruiting new members, underwriting the inflow of new business, underwriting renewal business, receiving premiums, and exchanging reinsurance contracts.

surance products indicates, according to Erie, that a unitary corporate decision was made on behalf of all the Erie insurance companies. As further proof of a singular corporate focus, Erie relates that none of its companies compete with each other concerning the sales of its various insurance products.[19]

To reach its determination that the Erie corporations were capable of concerted activity for purposes of antitrust law, the trial court looked to the fact that Erie Family Life was not a wholly-owned subsidiary.[20] Critically, there was no examination regarding the facts of Erie's corporate structure to determine whether the various Erie companies were sufficiently independent of each other to prevent them from serving a unified corporate interest. *See Williams v. I.B. Fischer Nevada,* 999 F.2d 445, 447 (9th Cir. 1993) ("To be capable of conspiring, corporate entities must be 'sufficiently independent of each other' "). Similarly, there was no analysis of whether the Erie corporations and the Erie Insurance Exchange "have unified economic objectives and the same corporate purpose" and whether the Erie companies are "closely knit and mutually dependent." *Coast Cities Truck Sales,* 912 F.Supp. at 765. All the trial court did was to summarily conclude with no accompanying analysis that "there was substantial evidence that those defendants were separate economic actors, and not merely a single firm."

■ By looking solely to the issue of subsidiary ownership, the trial court overlooked the predicate tenet upon which *Copperweld* is based: employees of the same company cannot conspire with each other within the meaning of antitrust law. In *Gray v. Mar-*

*shall County Board of Education,* 179 W.Va. 282, 367 S.E.2d 751 (1988), this Court adopted the language of *Copperweld,* holding in syllabus point one:

> The officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals; *accordingly, officers or employees of the same firm do not provide the plurality of actors imperative for an actionable conspiracy under W.Va.Code, 47–18–3(a)* [1978].

179 W.Va. at 282, 367 S.E.2d at 751 (emphasis supplied). It is axiomatic that a corporation acts only through its officers, agents, and employees [21] and that a corporation cannot conspire with its own employees.[22] Because all of Erie's employee were employed by Erie Indemnity, Erie argues that the requisite plurality of actors necessary to create an actionable conspiracy under West Virginia Code § 47–18–3(a) is missing. We agree. With regard to Appellees' claims that the Erie companies conspired in violation of West Virginia Code § 47–18–3(a), we conclude that these companies were legally incapable of conspiring with each other. Consequently, Appellees failed to meet their burden of demonstrating concerted action between two legally distinct entities. *See Oksanen,* 945 F.2d at 702.

■ As an alternative to alleging a wholly internal corporate conspiracy, Appellees sought to make Mr. Webb a part of the conspiracy. Whereas the alleged internal conspiracy involved the various Erie companies agreeing to cease doing business with Appellees,[23] an alternative conspiracy alleged

---

**19.** Erie Insurance sells standard tier personal and commercial policies in Virginia; Erie Insurance Property and Casualty sells personal and commercial policies in West Virginia; Erie Family Life Insurance sells life insurance in Virginia and West Virginia; and Erie Insurance Exchange sells preferred tier personal and commercial insurance in Virginia.

**20.** As an additional basis for its ruling, the trial court cited the fact that Erie Indemnity and Erie Insurance Exchange were not wholly-owned subsidiaries. Erie Indemnity was the parent corpo-

ration and Erie Insurance Exchange is an unincorporated entity. *See supra* note 18.

**21.** *See Gray,* 179 W.Va. at 286, 367 S.E.2d at 755.

**22.** *See Cook v. Heck's, Inc.,* 176 W.Va. 368, 375, 342 S.E.2d 453, 460 (1986).

**23.** Even if the various Erie companies could have been capable of conspiring for purposes of antitrust law, the act of terminating the agreement could not demonstrate an unreasonable

by Appellees was that by successfully pressuring Mr. Webb to tender State Auto production figures Mr. Webb became part of a conspiracy to illegally restrain trade. *See Perma Life Mufflers, Inc. v. Internat'l Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968) (recognizing that antitrust plaintiff can be part of combination necessary to establish antitrust claim). In concluding that Mr. Webb was part of a conspiracy to illegally restrain trade, the trial court cited the napkin tendered by Mr. Webb during his October 2003 restaurant meeting with Mr. Fletcher which contained a figure representing policy sales by Insurance Associates on State Auto's behalf. Besides the napkin, the judge relied upon a tape recorded telephone call between Mr. Carl Olian, Erie's district sales manager, and Mr. Webb on December 16, 2003, during which Mr. Olian expressed his concern that State Auto was getting more of the new business that walked through the doors of the Agency's office.[24] Referencing the napkin and the telephone recording, the trial court opined in its order of May 27, 2008, that this evidence "proves the inclusion of the Plaintiff Kevin Webb into the combination or conspiracy to reduce business going to State Auto Insurance Companies."

Without addressing whether Appellees would have standing to recover alleged economic injury for antitrust injury sustained by State Auto, we do not agree with the trial court's conclusion that Mr. Webb was a co-conspirator within the meaning of antitrust law. The tendering of the napkin with production information related to State Auto sales was not an illegal act, under antitrust law or otherwise. Mr. Webb testified that he had provided similar production information concerning Erie sales to State Auto and that this was customary within the industry. As an intended benefactor of the agency agreement, Erie had the clear right to inquire of Mr. Webb whether policy sales that previously went to it were now going to State Auto. The fact that the agency agreement could be terminated by either party with ninety days notice indicates that whenever either Erie or Appellees determined that the arrangement was not economically advantageous, the agreement would be discontinued. *See Balaklaw v. Lovell*, 14 F.3d 793, 799 (2nd Cir. 1994) (discussing previous rejection of "antitrust challenge to an anesthesiology contract in part because the parties were free at the end of any six-month period to terminate the agreement," observing that such arrangements "may actually encourage, rather than discourage, competition because the incum-

---

restraint of trade without evidence of a corresponding injury of the type sought to be protected by antitrust laws. *See Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (holding that antitrust plaintiff must prove "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful"); *accord Balaklaw v. Lovell*, 822 F.Supp. 892, 903 (N.D.N.Y.1993), *aff'd* 14 F.3d 793 (2d Cir.1994) (recognizing that conspiracy alone is insufficient as antitrust plaintiff is "still . . . required to demonstrate that the purpose or effect of the alleged conspiracy constituted an unreasonable restraint of trade resulting in his antitrust injury").

**24.** In pertinent part, the conversation was as follows:

Mr. Olian: I stressed that last year when we met with you in January . . . . we have 94,000 in new business that's been sent our way, it may be difficult for you Kevin [Webb] just to look at it this way, but it's going—we're going to be hard pressed to convince anyone at home office that the majority of new business coming

into your agency or coming through your front door, however you want to say it, since there apparently is two separate entities inside that same building, that . . . the majority of that new business that walks into that door is not going to state auto versus us.

Mr. Webb: . . . I give Erie what Erie asked for, so I wrote business within the spirit of the AWARE [Agents Writing and Rewriting] Program, so if it come in and it wasn't within the spirit of the AWARE Program, I did not write it with Erie.

Mr. Olian: Okay. When you're saying within the spirit of the AWARE Program, . . . clarify that for me. .

Mr. Webb: . . . you said you didn't want business with claims, you didn't want bad business, you wanted . . . Basically, the premium business, and you wanted . . . multiple-policy business. So we spent the biggest portion of the year re-underwriting the F and M book of business and taking Erie quality homes and . . . matching it up with auto. . . . So, basically, the spirit of the AWARE Program was to have two policies with somebody. . . . And the new business I placed with Erie, . . . I give them the premium business that they asked for.

bent and other, competing anesthesiology groups have a strong incentive continually to improve the care and prices they offer in order to secure the exclusive positions"). And that is exactly what happened in this case: Erie simply determined that a continued relationship with Appellees was no longer commercially reasonable.

Just as there was no evidence of concerted action between the Erie companies, there was also no evidence of concerted action within the meaning of antitrust law between Mr. Webb and Erie. Neither the napkin nor the telephone recording is persuasive of Mr. Webb's participation in an illegal conspiracy under antitrust law. *See Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) (requiring specific evidence of plaintiff's acquiescence or agreement tending to prove "a conscious commitment to a common scheme designed to achieve an unlawful objective" to prove that antitrust plaintiff is part of conspiracy). As we recognized in *Gray*, "the gravamen of a W.Va.Code, 47–18–3(a) antitrust violation is a *conspiracy*." 179 W.Va. at 286, 367 S.E.2d at 754–55. Appellees' failure to demonstrate the requisite element of concerted action is fatal to their attempt to prove an antitrust claim.

### 2. Antitrust Injury

▬ Assuming, *arguendo*, that Appellees had been able to establish the element of concerted action required to establish an antitrust claim, they would have had to prove injury of the type that antitrust laws were designed to protect against. *See Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Given that the overarching objective of antitrust laws is to protect competition rather than competitors, "[i]t follows ... that injuries resulting from competition alone are not sufficient to constitute antitrust injuries." *Balaklaw*, 14 F.3d at 797. As the Third Circuit explained in *Mathews*,

> In antitrust cases, a plaintiff must prove "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." In other words, because "antitrust law aims to protect competition, not com-

petitors, [a court] must analyze the antitrust injury from the viewpoint of the consumer." "An antitrust plaintiff must prove that challenged conduct affected the prices, quantity or quality of goods or services, not just his own welfare."

87 F.3d at 641 (citations omitted and emphasis supplied); *accord Tal v. Hogan*, 453 F.3d 1244, 1258 (10th Cir.2006) (observing that "the primary concern of the antitrust laws is the corruption of the competitive process, not the success or failure of a particular firm").

▬ To demonstrate an antitrust injury, a plaintiff must show that the concerted action imposed an unreasonable restraint on trade. *See Business Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 723, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988) (recognizing that Sherman Act was intended to prohibit "only unreasonable restraints of trade"). As the Fourth Circuit explained in *Oksanen*, "a plaintiff cannot demonstrate the unreasonableness of a restraint merely by showing that it caused him an economic injury." 945 F.2d at 708. Elaborating, the Court in *Oksanen* stated:

> [T]he fact that a hospital's decision caused a disappointed physician to practice medicine elsewhere does not of itself constitute an antitrust injury. If the law were otherwise, many a physician's workplace grievance with a hospital would be elevated to the status of an antitrust action. *To keep the antitrust laws from becoming so trivialized, the reasonableness of a restraint is evaluated based on its impact on competition as a whole within the relevant market.*

*Id.* at 708 (emphasis supplied).

▬ There are two approaches to demonstrating an unreasonable restraint on trade: *per se* and the rule of reason. *Per se* violations are comprised of those acts that the law views as "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality" such as group boycotts and price-fixing agreements. *National Soc'y of Prof'l Engineers v. U.S.*, 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). Only where the economic effects of the restraint are clear, however, can a *per*

*se* violation exist. *See Oksanen* 945 F.2d at 708; *accord Cogan v. Harford Mem'l Hosp.*, 843 F.Supp. 1013, 1018–19 (D.Md.1994). The case alleged by Appellees does not fall into a *per se* category. In what constitutes the bulk of antitrust claims, the plaintiff has to demonstrate under "the rule of reason" approach specifically how the alleged conspiratorial conduct adversely affected competition in the relevant geographic market. *See Oksanen*, 945 F.2d at 709; *see also Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 31, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) (noting that absent "showing of actual adverse effect on competition, respondent cannot make out a case under the antitrust laws"); *Estate Const. Co. v. Miller & Smith Holding Co.*, 14 F.3d 213, 222 (4th Cir.1994) (recognizing that mechanical assertion of Sherman Act grounds without evidence of market power and restraint of trade is fatal to antitrust claim).

Erie argues that Appellees failed to introduce any evidence of either the relevant geographic market or the adverse effects on competition that resulted from the alleged conspiratorial conduct. Without evidence of what share of the insurance market that Erie had in Mercer County, assuming that to be the relevant geographic area, there is no way to determine whether Erie "possess[ed] the market power necessary to significantly restrain trade." *Oksanen*, 945 F.2d at 709. To attempt to prove antitrust injury solely by loss of income, as Appellees did in this case, is insufficient. Appellees were required to show "injury to competition in the form of increased cost, reduced supply of services, or harm to the ... [policyholders]." *Patel v. Scotland Mem'l Hosp.*, 1995 WL 319213 at *6 (M.D.N.C.1995), *aff'd* 91 F.3d 132 (4th Cir. 1996). As the Court reasoned in *Oksanen*, the plaintiff, "as an individual competitor may have been hurt by the hospital's decision to revoke his privileges, but *there is no evidence that competition as a whole in the relevant market has been harmed.*" 945 F.2d at 709 (emphasis supplied). Given that the consumer is the focus of anticompetitive conduct, it is fatal to Appellees' claim that they failed to introduce any evidence of how competition within the relevant insurance market was harmed. *See NYNEX Corp. v.*

*Discon, Inc.*, 525 U.S. 128, 135, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998) (stating that antitrust plaintiff must prove that defendant's conduct caused anticompetitive harm "not just to a single competitor, but to the competitive process, *i.e.*, to competition itself"). As the Third Circuit reasoned in *Mathews*, "because orthopedic services are still readily available to consumers in the Lancaster area from a large and ever-increasing number of providers," the "evidence d[id] not support the existence of an antitrust injury." 87 F.3d at 641.

Numerous courts have concluded that actions brought as antitrust violations often involve nothing more than personal economic injury. *See, e.g., Patel*, 1995 WL 319213 at *6; *Cogan*, 843 F.Supp. at 1020 ("Stated simply, Cogan's position is that he has been harmed as an individual competitor. He has not shown that the defendants' activities adversely impacted price, quality or output of medical services offered to consumers."); *Balaklaw*, 822 F.Supp. at 899 (stating that "allegations of anti-competitive injury are, in reality, merely injury to the plaintiff of a personal nature"). The harsh reality of the business world was summarized in *Konik v. Champlain Valley Physicians Hosp.*, 733 F.2d 1007 (2nd Cir.1984): "It is the nature of competition that at some point there are winners and losers, and the losers are excluded." *Id.* at 1015. And, as Justice Richard Neely aptly stated in *Gray*, "antitrust laws are not designed to deter all the evils known to modern commercial life; rather, they are designed to deter one specific evil— namely anti-competitive, conspiratorial *economic* behavior." 179 W.Va. at 288, 367 S.E.2d at 757.

Just as Appellees failed to prove an actionable conspiracy under antitrust law, they similarly failed to demonstrate an antitrust injury. If the damages alleged in an antitrust case could occur despite the alleged anticompetitive conduct, then the damages are *not* antitrust damages. *Brunswick*, 429 U.S. at 488, 97 S.Ct. 690. Because the damages Appellees asserted were solely attributable to lost income and thus damages that could have been sustained whenever the

agency agreement was terminated independent of any anticompetitive conduct, those alleged damages were not antitrust damages.[25] *See id.* The record in this case confirms that Appellees failed to introduce evidence to prove that competition among insurers in the relevant geographic market was harmed as a result of the termination of the agency agreement. At best, Appellees demonstrated a "personal economic injury." *Patel,* 1995 WL 319213 at *6. As discussed above, the antitrust laws are not aimed at protecting individual competitors from sustaining economic loss. "[I]f the alleged conspiracy did not restrain competition ... there can be no resulting antitrust violation." *Newman v. Universal Pictures,* 813 F.2d 1519, 1522 (9th Cir.1987). Because Appellees

failed to prove anticompetitive harm of the ilk governed by the antitrust laws,[26] they have failed to demonstrate their entitlement to recovery under West Virginia Code § 47–18–3.[27] Accordingly, Erie was entitled to judgment as a matter of law.

Based on the foregoing, the decision of the Circuit Court of Mercer County is reversed.

Reversed.

---

**25.** Of note is the fact that Appellees' economic expert witness, Daniel Selby, confirmed at trial that "if this was a proper termination of the agency contract, there are no damages."

**26.** *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 225, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993) (recognizing that "[e]ven an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws").

**27.** Because we are reversing the lower court based on Appellees' failure to establish an antitrust claim, we find it unnecessary to address Erie's additional assignments of error predicated on the wrongful inclusion of alleged antitrust injury affecting Virginia residents and the wrongful inclusion of lost future commissions in the damage award.