Sykes v.  Health Network Solutions, Inc., 2013 NCBC 53.

STATE OF NORTH CAROLINA

COUNTY OF FORSYTH

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
13 CVS 2595

SUSAN SYKES d/b/a ADVANCED
CHIROPRACTIC AND HEALTH
CENTER; DAWN PATRICK; TROY
LYNN; LIFEWORKS ON LAKE
NORMAN, PLLC; BRENT BOST; and
BOST CHIROPRACTIC CLINIC, P.A.,

Plaintiffs,

v.

HEALTH NETWORK SOLUTIONS,
INC. et al.,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

ORDER ON MOTION FOR
PRELIMINARY INJUNCTION

{1}     THIS MATTER, designated a complex business case by Order of Chief Justice Sarah Parker dated May 30, 2013, was assigned to this court on June 7, 2013, and is now before the court on Plaintiffs' Motion for a Preliminary Injunction ("Motion") pursuant to Rule 65 of the North Carolina Rules of Civil Procedure ("Rule(s)"), which seeks to enjoin the termination of Dr. Troy Lynn's ("Dr. Lynn") participation in the network maintained by Health Network Solutions, Inc. ("HNS").

{2}     Defendants have separately moved to dismiss the Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6), which will be addressed in a subsequent order.  For purposes of the present Motion, the court determines whether Plaintiffs have demonstrated a likelihood that they will succeed on any of the claims.

*Oak City Law, LLP, by Robert E. Fields III and Samuel Piñero II, Doughton Rich Blancato PLLC by William A. Blancato, and Wells, Jenkins, Lucas & Jenkins, PLLC by Leon E. Porter and Ellis B. Drew III, for Plaintiffs.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, by Jennifer K. Van Zant, Benjamin R. Norman, and W. Michael Dowling for Defendants.*

Gale, Judge.

# INTRODUCTION

{3}     Plaintiffs bring this putative class action seeking to declare unlawful, enjoin the implementation of, and to recover damages because of contracts between HNS on the one hand with its chiropractic providers and with insurers providing coverage for chiropractic services on the other.  At present, Dr. Lynn is the only named Plaintiff in contract with HNS.  He seeks to enjoin his threatened termination.

{4}     Before addressing the facts and claims in more specific detail, the court first provides a broad overview.   The Amended Complaint consists of 37 pages, 181 separately numbered paragraphs with five causes of action.  Plaintiffs summarize as follows:

> The gravamen of this case is that Defendants have established an illegal cartel to extort monopsony rents from Plaintiffs and other similarly situated chiropractors.  Defendants also limit Plaintiffs' opportunities to sell their services by restricting Plaintiffs' ability to provide care to their patients for reasons unrelated to the medical necessity for such care or the quality of care.  Defendants fixed the prices for Plaintiffs' services as well as those of other in-network chiropractors in derogation of free and efficient competition in the marketplace.  Defendants have engaged in comprehensive violations of regulations designed to protect Plaintiffs from unfair and inappropriate insurer interference with the professional and clinical relationship between physician and patient.

(Mem. in Opp. to Mot. to Dismiss ("Opp. to Mot. to Dismiss") 2.)

{5}     Defendants attack these claims as only an effort to mask Plaintiffs' inefficient practices.  HNS champions its network as a lawful independent practice association which promotes and achieves efficient and quality care, with neither market power nor anticompetitive practices.  Defendants further challenge that, even if the harms of which Plaintiffs complain are assumed, they are actionable only by the Commissioner of Insurance or the individual patients allegedly harmed by those practices.

{6}     The court concludes that Plaintiffs invoke claims which, if they are allowed to proceed, will require a factual record significantly more developed than

that now before the court, and that on the present record, the court cannot conclude that Plaintiffs have shown a likelihood of success adequate to support the issuance of a preliminary injunction on Dr. Lynn's behalf. Accordingly, after considering matters of record, oral argument and documents presented at the hearing, and the authorities cited, the Motion is DENIED for the reasons stated below.

## I. FINDINGS OF FACT

{7} The court makes the following findings of fact solely for the purposes of the Motion which are not law of the case binding on further proceedings. *See DaimerChrysler Corp. v. Kirhart*, 148 N.C. App. 572, 578, 561 S.E.2d 276, 282 (2002) (citing *Kaplan v. Prolife Action League of Greensboro*, 111 N.C. App. 1, 16, 431 S.E.2d 828, 835 (1993)).

{8} Dr. Lynn is a chiropractor licensed to practice chiropractic in the state of North Carolina who resides and practices in Iredell County, North Carolina in association with Plaintiff Lifeworks on Lake Norman, PLLC of which Dr. Lynn is part owner. (Am. Compl. ¶ 3.) Dr. Lynn is currently a member of the HNS network. (Am. Compl. ¶ 38.) He has practiced chiropractic in Iredell County for approximately five years, the same length of time he has been a member of the HNS network. (Am. Compl. ¶¶ 37, 38.)

{9} HNS is a corporation operating primarily in North Carolina. (Am. Compl. ¶¶ 5-6.) HNS refers to itself as an independent practice association ("IPA") made up of a network of chiropractors ("Providers"). (Affidavit of Frances E. ("Parker") Binder ("Binder Aff.") ¶¶ 1, 3.) Individual member-chiropractors enter into individual contracts with HNS, referred to as a Practitioner Participation Agreement ("PPA"). (Binder Aff. ¶ 3.)

{10} Dr. Michael Binder, Dr. Steven Binder, Dr. Stroud, Dr. Grossman, Dr. Schmid, Dr. Ransone, Dr. Baldwin, Dr. Rubin, Dr. Armstrong, Dr. Doyle, Dr. Batchelor, Dr. Smith, Dr. Jackson, and Dr. Hooper ("Individual Defendants"), are, or were at all relevant times, practicing chiropractors in North Carolina, who Plaintiffs allege own or owned an interest in HNS. (Am. Compl. ¶ 23.) Plaintiffs

assert that the individual Defendants are competitors who have conspired to harm chiropractors who do not practice within the HNS network. (Am. Compl. ¶¶ 130-31.)

{11} Dr. Lynn entered into a PPA with HNS on March 29, 2007. (Affidavit of Dr. Troy Lynn ("Lynn Aff.") ¶ 5.) His PPA includes an agreement to participate in and abide by HNS's "Quality Assurance, Claims Payment Protocols, and Utilization Review Program(s)." (Binder Aff. Ex. B ¶ 3.7.)

{12} HNS negotiates with insurance companies and other third-party purchasers of chiropractic services ("Payors") to establish reimbursement rates for its member-chiropractors. (Binder Aff. ¶ 4.) Plaintiffs assert that in doing so, HNS is an agent for the individual chiropractors in the network, with fiduciary duties owed by an agent. (Am Compl. ¶ 71.)

{13} The PPA agreements provide that members will be reimbursed at the HNS-Payor negotiated rate for chiropractic services. (Binder Aff. Ex. B at ¶¶3.1-3.11). Payments are made by the Payors directly to HNS, which then retains a variable percentage before remitting the remainder to the individual provider.

{14} Insurance policies may provide for either "in-network" or "out-of-network" services. (Am. Compl. ¶ 62.) Generally, insureds are required to make a "co-payment," which is an amount above the cost the payor reimburses. (Am. Compl. ¶ 148.) Co-payments for out-of-network services may be significantly higher than for in-network services, and in some instances the co-pay for out-of-network services is only slightly less than the total provider charge. (Am. Compl. ¶ 62.)

{15} Plaintiffs allege that HNS is the exclusive network provider for the Payors with which it contracts, and that these Payors, including Blue Cross Blue Shield of North Carolina ("BCBSNC"), Cigna Healthcare ("CIGNA") and MedCost, dominate the market of insured chiropractic services. (Am. Compl. ¶ 60.) Defendants deny that HNS is an exclusive provider for BCBSNC or CIGNA, and deny that the Payors dominate the market. (Mem. in Support of Mot. to Dismiss "Mot. to Dismiss" 4, n. 3.)

{16}    The limited record now before the court suggests that, on December 31, 2012, there were 1,667 licensed resident chiropractors in North Carolina of which 1,006 were HNS members.  (Mem. of Law. in Support of Mot. for Prelim. Inj. ("Mot. for Prelim. Inj.") Ex. 13); *North Carolina Board of Chiropractic Examiners*, FEDERATION OF CHIROPRACTIC LICENSING BOARDS: OFFICIAL DIRECTORY (July 22, 2013), directory.fclb.org/US/NorthCarolina.aspx (last visited Nov. 6, 2013) [hereinafter "Official Licensing Directory"] and that on October 16, 2013, 1,647 chiropractic physicians were actively treating patients in North Carolina.  (Mot. for Prelim. Inj. Ex. 12.)

{17}    HNS processes the claims its members make on the Payors.  (Binder Aff. ¶ 5.)  HNS receives payment and retains a percentage in return for its claims-processing and negotiating services.  (Am. Compl. ¶ 69.) The percentage HNS charges its members varies depending on the member's average cost per patient, with the retained percentage increasing as the members' average cost per patient increases.  (Am. Compl. ¶ 69.)  HNS receives payment from Payors for Providers' chiropractic services under a single tax identification number.  (Am. Compl. ¶ 81.)

{18}    A chiropractor who is not in HNS's network typically must submit claims directly to Payors to receive direct reimbursement.  (Am. Compl. ¶ 62); (Binder Aff. ¶ 5.)   If a chiropractic provider is not in the HNS network, he or she may submit claims directly to CIGNA and MedCost and will receive direct reimbursement from those Payors, provided the patient has out-of-network benefits.  (Supp. Binder Aff. ¶ 5.)  For services provided to BCBSNC members out of network, the provider must bill the patient directly.  (Binder Aff. ¶ 5); (Supp. Binder Aff. ¶ 5.)

{19}    HNS also performs credentialing services for the Payors, which includes confirming proper licensure for all of its participating physicians, conducting background checks, consulting with malpractice carriers, and verifying that participant providers meet certain other established criteria.  (Binder Aff. ¶ 6.)

{20}    HNS implements a Quality Management and Improvement Plan ("QMI Plan" or "quality assurance program").  HNS asserts the program is designed to assure that Providers rendering services to subscribers are qualified and that the

services provided to subscribers that each physician codes "are of optimal quality and delivered in the most effective and cost-efficient manner." (Binder Aff. ¶ 7.) HNS characterizes the review as "a retrospective quality assurance review of the services provided by its participants." (Binder Aff. ¶ 8.) HNS refers to this form review as its Comparative Practice Patterns Review ("CPP Review"). (Binder Aff. ¶ 10.).

{21} Plaintiffs claim that the HNS program must be considered "utilization review" which can only be performed by an entity licensed by the Department of Insurance ("DOI") and which cannot be based exclusively on average costs but must take into account the medical necessity of patient services. HNS counters that it does not assess medical necessity or insurance coverage and its cost based review is neither utilization review within the meaning of the insurance laws nor requires that HNS be licensed.

{22} HNS describes the purpose of its CPP in his written policies as follows:

(1) promote and enhance the delivery of safe, quality health care services in the most cost effective and efficient manner; (2) provide a system to monitor the delivery of chiropractic health care services in a timely, effective and cost-efficient manner, consistent with the delivery of quality care; (3) continually monitor, evaluate and optimize the safety, effectiveness and cost-efficiency of health care; (4) identify events and patterns of care that may indicate suboptimal practices and institute actions to improve performance; [and] (5) promote physician collaboration in HNS initiatives to enhance safety, quality and cost-effectiveness of health care services through education, support and outreach.

(Binder Aff. ¶¶ 9-10, Exhibit A.) According to HNS, the review is based on a physician's average cost per patient and does not depend on reviewing any individual patient's claims. (Binder Aff. ¶ 11); (Binder Aff. Ex. A 14-29.) HNS does not make any determinations of medical necessity. (Binder Aff. ¶ 12, Ex. A.)

{23} HNS provides its member-chiropractors with reports ("CPP Reports") monthly and annually. (Binder Aff. ¶ 14.) These Reports advise a providing member of his average cost per patient on a Payor-by-Payor basis. (Binder Aff. ¶ 8.)

{24} HNS has established a maximum allowable average cost per patient

that a Provider may maintain and remain in the HNS network, which is presently 151% of the HNS network average.  Any Provider who exceeds this benchmark is first placed on probation and is then at risk of termination absent improvement.  (Binder Aff. ¶ 15.) (Am. Compl. ¶ 115.)   A Provider on probation pays a greater percentage of her reimbursements to HNS.  (Am. Compl. ¶ 69); (Supp. Binder Aff. ¶ 22.)  HNS notifies Payors when a Provider is terminated.  (Mot. for Prelim. Inj. 4.).

{25}   In general, chiropractic services provided to patients can be characterized as either "treatment," which are typically insured up to a certain limit on the number of treatment visits, and "maintenance," which are generally uninsured.  (Supp. Binder Aff. Ex. B.)

{26}   The governing board for chiropractors has established policies intended to limit treatment visits to only those which are effective and necessary. *See, e.g.*, *Guidelines for the Practice of Chiropractic in North Carolina*, NORTH CAROLINA BOARD OF CHIROPRACTIC EXAMINERS § IV(D) (May 2009) [hereinafter NC BOCE Practice Guides], *available at* www.ncchiroboard.com (click on "N.C. Practice Guides" in top left corner of the webpage).  These policies provide that an initial round of treatment visits should be of a limited number without further treatment based on a further assessment after the initial set of treatments has been completed.  (NC BOCE Practice Guides).  For example, the BOCE advises a physician to review the appropriateness of rendering further care after the earlier of twelve office visits or four weeks of treatment (i.e., one "treatment cycle").  (NC BOCE Practice Guides § VI(D).)  If, after two consecutive treatment cycles, the patient has not improved, the physician should assume the maximum therapeutic benefit has been reached.  (NC BOCE Practice Guides § VI(D).)

{27}   HNS has established an appeals process that precedes termination.  Physicians may appeal their probation status within 30 days of the date of its assignment. (Supp. Binder Aff. ¶ 16).  An appeal may be based on grounds including (1) whether the calculation of the provider's average cost per patient is incorrect, or (2) whether there is a legitimate basis for the high average.  (Binder Aff. Ex. A 21.)

{28}   To date, HNS has allowed only two chiropractors to remain in-network

with an average cost per patient in excess of 151%. (Supp. Binder Aff. ¶¶ 18, 19.) The first provider successfully appealed his probation because he was one of only a few chiropractors in the world sufficiently qualified to perform electrodiagnostic studies, for which BCBSNC would reimburse physicians. (Supp. Binder Aff. ¶ 18.) The second provider had high MedCost average costs per patient. (Supp. Binder Aff. ¶ 19.) However, because MedCost, unlike CIGNA and BCBSNC, covers chiropractic maintenance care, HNS determined that this provider's high costs were due to his appropriate billing for maintenance care. (Supp. Binder Aff. ¶ 19.) Both providers were removed from probationary status with HNS. (Supp. Binder Aff. ¶¶ 18, 19.)

{29}    During probation, physicians are provided with counseling from a member of the HNS Continuous Quality Improvement Committee. (Supp. Binder Aff. ¶ 16.) Plaintiffs aver that this counseling consists only of how to reduce average per patient cost by "converting the patient to cash, by categorizing covered services as uninsured 'maintenance', and by otherwise limiting covered care provided to patients." (Am. Compl. ¶ 101.) That is, Plaintiffs contend that HNS encourages its providers to manipulate billing or coding in order to stay below the maximum acceptable average cost per patient and does so without regard to a patient's entitlement to insurance coverage. (Am. Compl. ¶ 111.)

{30}    Plaintiffs contend that HNS is a "medical service corporation" within the meaning of Section 58-65-1, and that it conducts "utilization review" within the meaning of Section 58-50-61(a)(17).

{31}    An Insurer may contract with a network intermediary, and in doing so may or may not delegate its review of medical necessity. § 58-50-61(b). HNS contends that documents BCBSNC has filed with the Department of Insurance demonstrate that BCBSNC did not delegate its utilization review based on medical necessity to HNS. (Mot. for Prelim. Inj. Ex. 13.)

{32}     In sum, Plaintiffs contend that review of a provider's utilization must be based solely on medical necessity; otherwise there is improper discrimination among providers. Rather, such a review must be based on medical necessity and performed by a licensed entity.  Hence, HNS's CPP Review program is illegal.

{33}     The court is not aware of what position, if any, DOI has taken or might be expected to take on Plaintiffs' assertions.

{34}     In addition to challenges based on the insurance laws, Plaintiffs assert that Defendants' conduct violates North Carolina's statutes regarding competition, including Sections 75-1, 75-2, and 75-2.1.  They contend that HNS and its individual owners are an illegal cartel engaged in an anticompetitive conspiracy (Am. Compl. ¶ 132,) to provide fewer covered services for patients, lower quality of available services, and which results in increased co-pays and other out-of-pocket costs to patients.  (Am. Compl. ¶148.).  Consequently, Defendants enjoy the fruits of both an illegal monopoly and a monopsony, or alternatively, have attempted to monopolize or monopsonize the market.

{35}     To support their market based claims, Plaintiffs assert that the Payors with which HNS contracts control the market of insured chiropractic services, but do not further allege underlying market data.  (Am. Compl. ¶ 146.) (Opp. to Mot. to Dismiss 16-17.) Plaintiffs further contend that Defendants' market power forces chiropractors to join and remain in the HNS network to have access to the patient services Defendants control.  (E.g., Am. Compl. ¶ 86, Mot. for Prelim. Inj. 3.) Defendants counter that HNS provider contracts can be voluntarily terminated, leaving any Provider free to withdraw and form a competitive network.  (Binder Aff. Ex. B ¶ 8.4.)

{36}     The insurance and competition based claims are alleged on behalf of the putative class.  The Motion separately draws into focus facts individual to Dr. Lynn and facts leading to his proposed termination from the HNS network.  These considerations include the weight, if any, that the court, in considering interim injunctive relief should give to the question of whether Dr. Lynn could have, should have, or did, pursue an appeal through which provided or was able to provide

documents that his individual patient base has greater medical necessities that inevitably lead to a high cost per patient.

{37}     Dr. Lynn is now on probation. (Am. Compl. ¶ 39.)  He was first placed on probation in March 2010 and given six months to improve his average cost per patient.  (Binder Aff. ¶ 23.)  Dr. Lynn reduced his average cost per patient to below 151% of the average.  (Mot. for Prelim. Inj. Ex. 25.)  In October 2012, Dr. Lynn's average cost per patient again exceeded the maximum allowable percentage and he was assigned a twelve-month probationary status.  (Binder Aff. ¶ 28.)

{38}     Dr. Lynn did not appeal his probationary status when it was established in October 28, 2012.  (Binder Aff. ¶ 28.)  At least for certain months after October 2012, he brought his cost per patient average below the maximum allowable percentage. (Binder Aff. ¶ 29.)

{39}     In February 2013, Dr. Lynn's cost per patient metric was outside HNS's guidelines.  (Binder Aff. ¶ 39.)  HNS sent him a termination notice on February 6, 2013 with an effective termination date of March 20, 2013.  (Binder Aff. ¶ 29); (Am. Compl. ¶ 39.)  Dr. Lynn sent HNS a notice of appeal on March 4, 2013. A hearing was held, at which Dr. Lynn was represented by counsel.  (Binder Aff. ¶ 31.)  Following the hearing, HNS extended the probationary period.  HNS contends that Dr. Lynn offered no evidence justifying his high costs, and further that he has, on occasion, failed to perform the assessments NC BOCE recommends after initial treatments.  (Binder Aff. ¶ 30, Ex. B.)  When Dr. Lynn's average cost per patient remained outside of the benchmark, HNS sent him a termination notice on September 5, 2013 with an effective date of September 30, 2013.  (Binder Aff. ¶ 33.)

{40}     The Parties disagree on whether Dr. Lynn has been given an opportunity to avoid termination by demonstrating that his patient base is such that his average cost per patient inevitably exceeds HNS's maximum.  Dr. Lynn contends that HNS's own statistical data proves his point.  HNS counters that Dr. Lynn's history demonstrates his ability to practice within the acceptable range. Even so, Dr. Lynn asserts that HNS has made clear that it will consider "no other

grounds he would have for appealing his probationary status" other than evidence that HNS's underlying calculations are in error. (Mot. for Prelim. Inj. Ex. 28 p. 1.)

{41}   This court entered a Temporary Restraining Order on September 30, 2013, placing Dr. Lynn's termination on hold until October 30, 2013.  After an October 29, 2013 hearing on Plaintiff's motion for preliminary injunction, the court extended its prior Temporary Restraining Order to the earlier of (i) 5:00 p.m. on November 27, 2013, or (ii) the court's ruling on the present Motion.

## II. STANDARD OF REVIEW

{42}   Whereas the court will be required to accept Plaintiffs' allegations as true for purposes of Defendants' Rule 12(b)(6) motion, *Crouse v. Mineo*, 189 N.C. App. 232, 237, 658 S.E.2d 33, 36 (2008), the court may consider other materials and weigh the strength of Plaintiffs' claims in ruling upon the Motion seeking an injunction. *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 401, 302 S.E.2d 754, 759-60 (1983).

{43}   "A preliminary injunction is an extraordinary measure taken by a court to preserve the status quo of the parties during litigation." *A.E.P. Indus., Inc.*, 308 N.C. at 401, 302 S.E.2d at 760.  A court will issue a preliminary injunction only

> (1) if a plaintiff is able to show likelihood of success on the merits of his case and (2) if a plaintiff is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of a plaintiff's rights during the course of litigation.

*Id.* at 401, 302 S.E.2d at 759-60.  The movant bears the burden to establish its right to a preliminary injunction; a court will not grant the remedy lightly.  *Travenol Lab., Inc. v. Turner*, 30 N.C. App. 686, 692, 228 S.E.2d 478, 483 (1976).  The party seeking injunction must allege specific facts to support the court's required findings. *Schultz v. Ingram*, 38 N.C. App. 422, 428, 248 S.E.2d 345, 349-50 (1978).

{44}   Plaintiffs' claims invoke theories on which there is federal authority but no settled North Carolina precedent.  This court is not bound by federal precedent, but may examine federal decisions in search of potentially persuasive authority.  *Rose v. Vulcan Materials Co.*, 282 N.C. 643, 655, 194 S.E.2d 521, 530

(1973); *see also, e.g., R. J. Reynolds Tobacco Co. v. Philip Morris*, 199 F. Supp. 2d 362, 395-96 (M.D.N.C. 2002).

## III. ANALYSIS

{45}    The court groups Plaintiffs claims into two categories for analysis of demonstrated likelihood of success: claims based on the alleged violation of the insurance laws and  competition based claims pursuant to Chapter 75.

A. **Plaintiffs have not demonstrated a likelihood of success on claims based on Defendants' violation of North Carolina insurance laws.**

{46}    The court begins its analysis with consideration of Plaintiffs' initial assertions that HNS must be considered a "medical service corporation," as defined by Section 58-65-1, and that it conducts a utilization review subject to the requirements of N.C. Gen. Stat. § 58-50-61.

{47}    The pertinent statutes do not provide substantial guidance.  The Insurance Commissioner has broad authority over health care insurance and those involved in its delivery.  N.C. Gen. Stat. § 58-49-5 (2013).  It does not necessarily follow that HNS must be licensed by the Commissioner.  Section 58-65-1(a) covers any corporation organized for purposes of maintaining and operating a "nonprofit hospital or medical or dental service plan" and subjects such entities to regulation pursuant to Article 65 of the Insurance Code.  A hospital service corporation is defined as "any nonprofit corporation … operating a hospital or medical or dental service plan, as defined in this section." *Id.*  The term "medical service corporation" is not separately defined.  A medical service plan "includes the contracting for the payment of fees toward or furnishing of professional medical services," including chiropractic services pursuant to Chapter 90.  § 58-65-1(a).  The statute defines a "preferred provider" as one who agrees to accept special reimbursement from a regulated corporation in exchange for providing services to beneficiaries of a plan administered under Article 65. *Id.*  It is not clear whether HNS must be said to operate a "medical services plan" by contracting with the Payors for reimbursement

to Providers and then processing claims and payments for services its Providers render.

{48}    Even if HNS falls generally within the purview of Chapter 65, it is not clear that it must be licensed.  A corporation governed by Section 58-65-1)(a) is "exempt from all other provisions of the insurance laws of this State, unless otherwise provided."  *Id.*  Section 58-65-2 incorporates numerous provisions of the Insurance Code, but not Section 58-3-85, which expressly requires obtaining a license from DOI for those who provide "contracts of insurance."  Section 58-65-50 separately requires licensure for a "medical services corporation," returning again to the problem that this term is undefined.

{49}    The court further notes that the sections incorporated by Section 58-65-2 do not specify those provisions of the Insurance Code that provide for a private cause of action.

{50}    It is clear that DOI is aware of IPAs in general and the HNS network in particular.  HNS is identified on reports submitted by BSBSNC to DOI.  (Mot. for Prelim. Inj. Ex. 13.)  Plaintiffs claim that DOI has been involved in directing certain provisions that would be required of HNS's CPP Review Program.  (Mot. for Prelim. Inj. Ex. 2 pp. 1-2.)  Section 58-67-9(p) expressly refers to IPAs.  As discussed below, IPAs have received substantial attention within the health care industry, including the issuance of a form policy statement as to how federal antitrust laws might be applied to such associations.

{51}    In sum, it is unclear whether HNS is a medical service corporation which much be licensed.  It is equally unclear that the underlying statutes and implementing regulations reflect a public policy that necessarily support a private cause of action in addition to the Commissioner's enforcement power.  *See Cobb v. Pa. Life Ins. Co.,* ___ N.C. App. ___, 715 S.E.2d 541, 522 (2011).

{52}    Turning to Plaintiffs' claim that HNS conducts an illegal "utilization review," the court notes first that licensed insurers are required to have a "utilization review program."  Section 58-50-61 (c).  The term "utilization review" means "a set of formal techniques designed to monitor the use of or evaluate the

clinical necessity, appropriateness, efficacy or efficiency of health care services, procedures, providers or facilities." N.C. Gen. Stat § 58-50-61 (2013). Certain entities that conduct utilization review in regard to a "managed care plan" are referred to as "Utilization Review Organizations." § 58-50-61)(a)(18). An insurer's utilization review program may allow but does not require that the insurer delegate its utilization review function. Reports submitted by BCBSNC to the DOI indicate that BCBSNC did not delegate its utilization review obligation to HNS. (Mot. for Prelim. Inj. Ex. 13.).

{53} HNS contends that its retrospective cost assessment is not a review within the statutory meaning of utilization review, which is based on medical necessity. Plaintiffs contend that any review of clinical efficiency must include the statutory factors and is illegal when it does not. (Am. Compl. ¶ 100).

{54} The court is not prepared at this stage of the litigation to conclude the Plaintiffs are likely to prove that Defendants have violated the insurance provisions on which they rely. It is not yet prepared to conclude that a private cause of action is warranted. Dr. Lynn has not demonstrated that he is entitled to a preliminary injunction based on his likelihood of success of proving that HNS and the Individual Defendants have violated the insurance laws upon which Plaintiffs' claims rest.

B. **Dr. Sykes has not developed any record that demonstrates that he is likely to succeed on his competition claims under Chapter 75.**

1. For purposes of this Motion, the court assumes Plaintiffs have standing to present their competition claims.

{55} As a part of their motion to dismiss, Defendants contend that Plaintiffs cannot demonstrate a requisite "antitrust injury," (Mot. to Dismiss 12-13,) and therefore have no standing to present their competition claims.

{56} The court will consider that contention in its separate order on the motion to dismiss. If Defendants are correct, then a preliminary injunction on these claims would obviously not lie. However, for purposes of this Motion, the court does not ground its determination on standing and proceeds to examine the claims and whether Plaintiffs have demonstrated a likelihood that they will succeed on them.

2. It is likely that Plaintiffs' claims must rest on a rule of reason analysis and not on any claim of a per se violation of the competition statutes, and the developed record does not allow a conclusion that any such analysis will be resolved in Plaintiffs' favor.

{57} Plaintiffs claims include assertions that Defendants are guilty of per se violations of Chapter 75, including price fixing and a boycott. The court concludes it is likely that all of the claims will have to be resolved in a larger factual context and if they survive the motion to dismiss will be more appropriately resolved by a rule of reason analysis.

{58} The mere presence of price related agreements in the various contracts at issue or exclusion of Plaintiffs from the HNS network do not necessarily lead to anticompetitive findings or per se violations. Certain price related agreements may be appropriate when necessary to achieve efficiencies that achieve procompetitive effects for consumers. Others may be so egregious and unaccompanied by other provisions so as to lead to illegality. But, in appropriate circumstances pricing related agreements may also be a necessary component of a more comprehensive set of undertakings that on the whole lead to beneficial and procompetitive efficiencies.

{59} The court ultimately might not follow federal precedent in fashioning the proper review standard under Chapter 75. But, in forecasting Plaintiffs' likelihood of success at this stage of the proceedings, the court finds useful a joint statement of the U.S. Department of Justice and the Federal Trade Commission. This statement specifically considered different forms of independent practice associations and whether they should be considered anticompetitive or procompetitive. Introducing its discussion of the many factors that must be considered in assessing their competitive effect, the Policy Statement begins:

> In recent years, health care plans and other purchasers of health care services have developed a variety of managed care programs that seek to reduce the costs and assure the quality of health care services. Many physician groups have organized physician network joint ventures, such as individual practice associations ("IPAs") . . . Typically, such networks contract with the plans to provide physician services to plan subscribers at predetermined prices, and the physician participants in the networks agree to controls aimed at containing

costs and assuring the appropriate and efficient provision of high quality physician services.  By developing and implementing mechanisms that encourage physicians to collaborate in practicing efficiently as part of the network, many physician network joint ventures promise significant procompetitive benefits for consumers of health care services.

U.S. Dep't of Justice and Federal Trade Commission, Statements of Antitrust Enforcement Policy in Health Care, Statement 8: Enforcement Policy on Physician Network Joint Ventures § B(1) (revised August 1996) [hereinafter ("Policy Statement 8" or "1996 Health Care Statement 8")], *available at* http://www.ftc.gov/bc/healthcare/industryguide/policy/statement8.htm.

{60}    Policy Statement 8 recognizes that physician joint ventures through which physicians collectively agree on prices or price-related items may take many different forms, some of which might rise to the level of illegal price fixing and others which should be sheltered from attack under antitrust laws.  *Id.*  Accordingly, Policy Statement 8 concludes that "[a] determination about the lawfulness of physician network joint ventures . . . must be made on a case-by-case basis according to general antitrust principles[.]"  *Id.*  It further provides that,

[i]n accord with general antitrust principles, physician network joint ventures will be analyzed under the rule of reason, and will not be viewed as per se illegal, if the physicians' integration through the network is likely to produce significant efficiencies that benefit consumers, and any price agreements (or other agreements that would otherwise be per se illegal) by the network physicians are reasonably necessary to realize those efficiencies.

*Id.* at § B(1).

{61}    Using several potential variants of physician joint venture networks to frame its discussion, Policy Statement 8 recognizes that the analysis is fact intensive and may include several factors, including a definition of the market to which the analysis will be applied, the competitive nature of and the allocation of power within that market, whether the network under attack is an exclusive provider, the degree of sharing of financial risk by network participants, the degree of practice integration to achieve efficiencies or that are instead barriers to efficiencies,  and other evidence of other anticompetitive purpose. *Id.* at § B(2).

{62}    Policy Statement 8 then recommends that a four-step process be employed to complete the rule of reason analysis, and recognizes that the complexity of the process may vary significantly from case to case.  Those four steps are: defining the market; evaluating the competitive effects of the physician joint venture; evaluating the impact of procompetitive efficiencies; and examining collateral agreements.  *Id.* at § B(2).

{63}    The North Carolina Court of Appeals has applied the rule of reason in other contexts, concluding that the burden is on the party asserting a restraint's illegality to prove its unreasonableness.  *Rose*, 282 N.C.643, 657-58, 194 S.E.2d 521, 531 (1973).

{64}    The present record does not allow the comprehensive analysis suggested by Policy Statement 8.  Many of Plaintiffs' assertion about how the market should be defined, how the various players fit within that market, who, if anyone, in fact has market power, the actual effect of conduct within that market, and other factors necessary to a complete analysis have been broadly stated but they are not yet supported with more detailed facts.  It is clear that Defendants will aggressively challenge any of Plaintiffs' claims that survive the motion to dismiss.  The court cannot and does not on the present record conclude that Plaintiffs have demonstrated a likelihood of their success on their competition claims.  Those claims do not then support the entry of a preliminary injunction.

C.    The same more developed factual record will be required to do any meaningful analysis on whether Plaintiffs' claims fall within the professional services exception of Section75.1.1 or whether Defendants can be charged with self-dealing in an agency relationship.

D.    The balancing of hardships does not decidedly tip in favor of either Party and compel that a preliminary injunction issue.

{65}    To secure a preliminary injunction, a party may show that it will suffer "irreparable injury" for which it has no adequate remedy at law, and in proper circumstances can do so by demonstrating that damages cannot be ascertained with certainty. *Hodge v. North Carolina Dep't of Transp.*, 137 N.C. App. 247, 252, 528

S.E.2d 22, 26 (2000). In determining whether to grant injunctive relief, the court should weigh the equities of each party. *Cnty. of Johnston v. City of Wilson*, 136 N.C. App. 775, 780, 525 S.E.2d 826, 829-30 (2000).

{66} If Dr. Lynn is able to prove that he has suffered a compensable loss, he may be compensated with money damages; indeed, his requested relief is for money damages. (Am. Compl. ¶¶ 169, 174, 179.) While his damages might ultimately be difficult to calculate, the court does not conclude that they are of such a "peculiar nature that compensation in money cannot atone for it." *Hodge*, 137 N.C. App. at 252, 528 S.E.2d at 26.

{67} The court appreciates the potential impact of Dr. Lynn's termination from the HNS network, and that certain effects may be hard to quantify monetarily. At the same time, the court recognizes potential harm to HNS and its network if it is unable to enforce those restrictions that it contends are necessary to achieve the efficiencies upon which the network is based.

{68} The court concludes that balancing of hardships does not decidedly tip in favor of either party.[1]

## IV. CONCLUSION

{69} The court therefore concludes that: (1) Plaintiffs have not demonstrated that they are likely to succeed on the merits of their claims; and (2) Dr. Lynn has not further demonstrated that he will suffer irreparable loss unless a preliminary injunction is issued. A preliminary injunction is not appropriate or necessary to protect Plaintiffs' rights during litigation.

NOW THEREFORE, based upon the foregoing FINDINGS OF FACT and CONCLUSIONS OF LAW, it is hereby ORDERED that the Motion by Plaintiffs seeking a preliminary injunction is DENIED.

IT IS SO ORDERED, this the 25th day of November, 2013.

---

[1] The court has not analyzed any of Plaintiffs' claims as grounded on breach of contract. To the extent that Dr. Lynn would have brought his action to restrain his termination as a contract claim, he would have been confronted with the mandatory arbitration provision of his contract. (Mot. to Dismiss Ex. C. ("Lynn PPA") § 9.15.)