Sykes v. Health Network Solutions, Inc., 2013 NCBC 55.

STATE OF NORTH CAROLINA

COUNTY OF FORSYTH

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
13 CVS 2595

SUSAN SYKES d/b/a ADVANCED
CHIROPRACTIC AND HEALTH
CENTER; DAWN PATRICK; TROY
LYNN; LIFEWORKS ON LAKE
NORMAN, PLLC; BRENT BOST; and
BOST CHIROPRACTIC CLINIC, P.A.,

Plaintiffs,

v.

HEALTH NETWORK SOLUTIONS,
INC. f/k/a CHIROPRACTIC
NETWORK OF THE CAROLINAS,
INC.; MICHAEL BINDER; STEVEN
BINDER; ROBERT STROUD, JR.;
LARRY GROSMAN; MATTHEW
SCHMID; RALPH RANSONE;
JEFFREY K. BALDWIN; IRA RUBIN;
RICHARD ARMSTRONG; BRAD
BATCHELOR; JOHN SMITH; RICK
JACKSON; and MARK HOOPER,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER ON MOTION TO DISMISS**

{1}     THIS MATTER is before the court on Defendants' Motion to Dismiss Plaintiffs' Amended Complaint ("Motion") pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the North Carolina Rules of Civil Procedure ("Rule(s)").  The Motion is DENIED, subject to the limitations expressed below.

> *Oak City Law, LLP, by Robert E. Fields III and Samuel Piñero II, Doughton Rich Blancato PLLC by William A. Blancato, and Wells, Jenkins, Lucas & Jenkins, PLLC, by Leon E. Porter and Ellis B. Drew III, for Plaintiffs.*

> *Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, by Jennifer K. Van Zant, Benjamin R. Norman, and W. Michael Dowling for Defendants.*

Gale, Judge.

{2}     On October 29, 2013, the court heard consolidated oral argument on Plaintiffs' Motion for Preliminary Injunction and Defendants' Motion to Dismiss. On November 25, 2013, the court entered its Order denying Plaintiffs' Motion for Preliminary Injunction, finding that Plaintiffs had not demonstrated a likelihood of success on their claims. The current Motion to Dismiss is determined on a standard more favorable to Plaintiffs. In determining whether Plaintiffs have adequately pleaded their claims, the court accepts their allegations as true and draws inferences in their favor. *See, e.g., Sutton v. Duke*, 277 N.C. 94, 98, 176 S.E.2d 161, 164 (1970); *Crouse v. Mineo*, 189 N.C. App. 232, 237, 658 S.E.2d 33, 36 (2008). The Motion does not turn on the strength of the claims, but only on whether the allegations are sufficient to state any claim. *Concrete Serv. Corp. v. Investors Grp., Inc.*,79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986). In considering the Motion to Dismiss, the court restricts its inquiry to the Amended Complaint and other documents which are specifically referred to or adopted by the pleadings. *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60–61, 554 S.E.2d 840, 847 (2001).

{3}     The court provided a detailed factual summary of Plaintiffs' claims in its November 25, 2013 Order. The court does not now repeat that summary, but is mindful that the facts recited there included matters raised in defense of the injunction request which are not properly considered when ruling on the Motion to Dismiss. Particular facts important to this Motion are noted.

{4}     Accepting all of Plaintiffs' allegations as true, as it must for the present Motion, the court concludes that Plaintiffs have adequately alleged the essential elements for the claims in the Amended Complaint, and the Amended Complaint therefore withstands the initial Motion to Dismiss. [1] The court has

---

[1] The court does not believe this initial conclusion depends on whether Plaintiffs' asserted violations are per se violations of competition statutes or are instead violations that must be assessed by a rule of reason analysis. Admittedly, under the rule of reason, the party asserting the restraint's illegality bears the burden of proving its unreasonableness. *Rose v. Vulcan Materials Co.*, 282 N.C. 643, 658, 194 S.E.2d 521, 531 (1973). The plaintiff must show: (1) facts peculiar to the business restrained; (2) the business's condition before and after the restraint was imposed; and (3) the nature and probable effect of the restraint. *Id.* Questions may remain as to whether Plaintiffs will ultimately sustain their proof, however, their broad allegations are adequate to withstand a Rule 12(b)(6) motion.

separately considered Defendants' standing argument, as it is cast, in part, as a challenge to the court's subject matter jurisdiction. The court concludes that Plaintiffs' have properly invoked the court's jurisdiction and the litigation may proceed toward a more detailed fact inquiry. That inquiry may include a reexamination of the arguments underlying the Rule 12(b)(1) motion.

{5}     While the court allows the Amended Complaint to survive the Motion, it further concludes that the imprecision of Plaintiffs' allegations, particularly as to the "market" within which Defendants are alleged to have acted, do not justify the typical full range of discovery before the contentions are refined with greater precision. The need for further clarification of the market may inform not just the competition claims, for other claims interrelate common facts. This clarification may be essential to inform determinations necessary for the resolution of any claim, including, for example, the issue of whether a class or subclasses should be certified and, if so, who would be a proper representative, and the standard or lens through which damage claims should be discovered and determined.

{6}     Accordingly, the court denies the Motion to Dismiss but will undertake to implement appropriate procedures to conform efficient discovery and consideration of other necessary pre-trial issues

{7}     It appears that Plaintiffs' Second Claim and Third Claim are the most critical, for the First, Fourth and Fifth Claims are substantially or totally dependent on them. The court refers to the Second and Third Claims collectively as the "competition claims," although the Third Claim further extends the claim of unfair and deceptive acts or trade practices. The First Claim essentially casts the remaining claims in the form of declaratory judgment. The Fifth Claim is a derivative claim for punitive damages.

{8}     The Second Claim sets forth the alleged anti-competitive conduct of which Plaintiffs complain and is premised on N.C. Gen. Stat. §§ 75-1, 75-2 and 75-2.1. The claim is labeled as "price fixing, monopsony and monopoly," but it also includes allegations of conspiracy and attempt to monopolize or monopsonize. The Amended Complaint does not assert a separate independent conspiracy claim, but

the court has depended on the conspiracy allegations in allowing claims to continue at this time against the Individual Defendants. A definition of the "market" and "market power" is essential to the monopoly, monopsony, and attempt theories of the Second Claim. *See R.J. Reynolds Tobacco Co. v. Philip Morris*, 199 F. Supp. 2d 362, 394 (M.D.N.C. 2002); *In re Se. Milk Antitrust Litig.*, 801 F. Supp. 2d 705, 724 (E.D. Tenn. 2011); *Powderly v. Blue Cross & Blue Shield of N.C.*, 3:08-cv-00109-W, 2008 U.S. Dist. Lexis 89406, at *4 (W.D.N.C. Sept. 4, 2008).[2]

{9}     The Third Claim is premised on N.C. Gen. Stat. § 75-1.1, but draws heavily from the same underlying facts anchoring the Second Claim. Adding to the competition claims, the Third Claim adds alleged violations of the Insurance Code as unfair and deceptive acts, most particularly that HNS (1) should be licensed, but is not and (2) should but does not include considerations of medical necessity when assessing efficiencies which govern a provider's ability to remain in the Network. Plaintiffs additionally allege that HNS unfairly represents its functions and benefits to its members and unfairly retains a percentage of fees resulting from member chiropractic services.

{10}     Assuming first without deciding at this time that Plaintiffs can ground their private cause of action on the insurance statutes they invoke, the court makes no present determination whether the insurance-related claims can stand independently if the completion claims fail. But, as presently alleged, the claims are interrelated so as to suggest further critical inquiry at the same time under a more fully developed record.

{11}     Plaintiffs ground their claims solely in state law. But in the absence of guiding state precedent, the court properly looks to federal approaches to similar issues for guidance. As indicated in its November 25, 2013 Order, the court finds the federal enforcement policy regarding IPAs to be instructive as to the record

---

[2] In addressing those issues, this court is not bound by federal precedent, but it properly considers federal decisions as potential persuasive authority. *Rose*, 282 N.C. at 655, 194 S.E.2d at 530.

necessary to assess the claims.[3]   Although the factors necessary to the record vary in accord with the nature of the agreements under attack, any meaningful analysis must be governed by an understanding of the "market" impacted by the claims and the allocation of power within that market.

{12}   Before discussing further how that record might be developed, the court turns to Defendants' challenge to the court's subject matter jurisdiction. Defendants assert the court has no such jurisdiction because Plaintiffs have not and cannot assert "antitrust standing," and therefore cannot pursue competition claims under Section 75-1, 75-2 or 75-2.1 and cannot pursue a private cause of action based on the insurance laws because of the exclusive enforcement authority of the Insurance Commissioner.

{13}   Standing arguments can be presented under both Rule 12(b)(1) and Rule 12(b)(6), as Defendants have done here. *See Teague v. Bayer,* 195 N.C. App. 18, 21-–22, 671 S.E.2d 550, 554 (2009); *Meadows v. Iredell County,* 187 N.C. App. 785, 787, 653 S.E.2d 925, 928 (2007).  The concepts underlying the rules and the standards of review are not necessarily the same.  As a jurisdictional matter, a Rule 12(b)(1) motion may draw upon and depend upon a more complete record than just the pleading upon which the Rule 12(b)(6) motion turns.  The Rule 12(b)(1) motion is in the nature of determining whether there is a concrete controversy suitable for judicial resolution and inquires whether the plaintiff has suffered an actual concrete injury that is not speculative, conjectural, or hypothetical. *Meadows,* 187 N.C. App. at 21–22, 671 S.E.2d at 554 (quoting *Neuse River Found., Inc. v. Smithfield Foods, Inc.,* 166 N.C. App. 110, 114, 574 S.E.2d 4 8, 52 (2009), *disc. rev. denied,* 356 N.C. 675, 577 S.E.2d 628 (2003)).  Standing arguments brought under Rule 12(b)(6) inquire whether the alleged facts fall within the scope and ambit of the underlying substantive claims.

---

[3] *Sykes v. Health Network Solutions, Inc.*, 2013 NCBC 53, ¶ 59 (N.C. Super. Ct. Nov. 25, 2013), (citing Joint Statement of the U.S. Department of Justice and the Federal Trade Commission ("Policy Statement 8")), http://www.ncbusinesscourt.net/opinions/2013_NCBC_53.pdf.

{14}     Accepting Plaintiffs' allegations as true, the court concludes that Plaintiffs have alleged injuries sufficiently concrete and particularized to present a justiciable claim over which the court has present subject matter jurisdiction.  To the extent that later proceedings warrant a reexamination of subject matter jurisdiction, ruling on a defect in subject matter jurisdiction has not been waived or foreclosed.  *Wood v. Guilford Cnty.*, 355 N.C. 161, 164, 558 S.E.2d 490, 493 (2002).

{15}     The court believes that that challenge to standing for lack of "antitrust injury" is more properly a Rule 12(b)(6) inquiry.  Plaintiffs and Defendants agree that there is no North Carolina case that has expressly recognized the concept of "antitrust injury" in the context of a Chapter 75 claim, although the concept appears well developed in federal precedent and has received substantial traction in several state courts.  *See, e.g.*, *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also Roberts v. Whitfill*, 191 S.W.3d 348, 354 (Tex. App. Waco 2006); *Princeton Ins. Agency, Inc. v. Erie Ins. Co.*, 225 W. Va. 178, 183 (W. Va. 2009); *Kanne v. Visa U.S.A. Inc.*, 272 Neb. 489 (Neb. 2006).  Plaintiffs argue that the liberality with which the courts have approached standing for Section 75-1.1 claims necessarily predicts the same liberality for claims under other provisions of Chapter 75.  *See Johnson v. Phoenix Mutual Life Ins. Co.,* 300 N.C. 247, 262, 266 S.E.2d 610, 620 (1980) (finding that Section 75-1.1, modeled after the FTC Act should be construed more broadly than the Sherman Act or Clayton Act).

{16}     The court is not yet persuaded that standing under Section 75-1.1 is necessarily coextensive with standing under Section 75-1, Section 75-2 or Section 75-2.1.  It does not now conclude that the Court of Appeals decisions in *Teague* and *Hyde v. Abbott Labs., Inc.,* 123 N.C. App. 572, 575, 473 S.E.2d 680, 682 (1996) mandate this conclusion.  Drawing upon decisions arising under Section 75-1.1, Plaintiffs attempt to reduce the standing issue to a simple proposition that, "[t]he only thing required to have standing is a violation of any of the provisions of Chapter 75 and a resulting injury."  (Opp. to Mot. to Dismiss 6-7.)   It may instead prove that the appellate courts will take a different approach to standing matched to a different scope of the various provisions of Chapter 75.  For example, in *Teague*,

Judge McGee noted that "[a]ntitrust laws were intended to protect competition and, thus, standing is generally limited to consumers or competitors." *Teague*, 195 N.C. App. at 26, 671 S.E.2d at 556–67. She cautioned against making that analysis solely on a review of a complaint, stated that "[a] trial court will be better suited to assess whether Plaintiff will be able to prove causation based on that alleged antitrust violation at the class certification and summary judgment stages." *Id.* In *Hyde*, Judge Wynn determined that a purchaser suffering antitrust damages should not be foreclosed from standing simply because his injury was indirect, electing not to follow federal precedent to the contrary. *Hyde*, 123 N.C. App. at 581, 473 S.Ed.2d at 686. That conclusion, however, does not altogether resolve whether the plaintiff must show a causal connection between the type of injury presented and the scope and purposes of the state's competition statutes.

{17} As to the lack of standing to invoke claims premised on insurance laws, Defendants argue that the claims should be dismissed at this early stage because of its holding that there can be no private right of action when the statute on which it is premised reflects that the General Assembly did not intend to create such a cause of action. *See Baars v. Campbell University*, 148 N.C. App. 408, 422, 558 S.E.2d 871, 879 (2009). Plaintiffs in turn assert that the insurance laws on which they rely "were designed to protect the consuming public," thereby making a Section 75-1.1 claim appropriate. *See Gray v. North Carolina Ins. Underwriting Ass'n*, 352 N.C. 61, 70-71, 529 S.E.2d 676, 682 (2000); *see also Stanley v. Moore*, 339 N.C. 717, 723, 454 S.E.2d 225, 228 (1995).[4] The court again concludes that the standing determination should await a more developed record.

{18} In sum, the court concludes that it has subject matter jurisdiction to proceed toward a more developed record, that Plaintiffs' have demonstrated

---

[4] Defendants further contend that any Section 75-1.1 claim would be barred by the exemption for professional services, citing *Cameron v. New Hanover Mem'l Hosp., Inc.*, 58 N.C. App. 414, 446, 293 S.E.2d 901, 920 (1982). In their brief, Plaintiffs argue that their claims do not arise from the practice of chiropractic, yet the Third Claim presenting the Section 75-1.1 claim begins with the recitation that "Defendants all practice chiropractic and are competitors with Class Members." (Am. Compl. ¶ 171.) As with other matters, the court believes that the application of the professional services exemption is interrelated to other matters on which a fuller record is necessary to any final determination.

standing adequate to withstand an initial Rule 12(b)(6) inquiry, that the question of whether the claims fall within the scope of the various sections of Chapter 75 should await a better developed record, and that the nature of the case deserves careful management in how that record is developed. The court now returns to that issue of case management.

{19} In denying the Motion to Dismiss, the court has been liberal in its acceptance of Plaintiffs' allegation that Defendants have requisite power in an appropriate market.[5] However, the breadth and imprecision of those allegations, coupled with the interrelation of the competition and other claims, prompt the court to exercise its case management discretion under Rules 16 and 26.

{20} Plaintiffs refer to the "relevant market" in at least three different ways in the Amended Complaint, supporting brief for the Motion for Preliminary Injunction, and the Opposition to Defendants' Motion to Dismiss. First, on at least six different occasions, Plaintiffs refer to a market of "insured chiropractic services in North Carolina." (Am. Compl. ¶ 125;) *see also* (Am. Compl. ¶ 146;) (Mem. in Supp. of Mot. for Prelim. Inj. 11;) (Opp. to Mot. to Dismiss 15, 16, and 17.) Second, Plaintiffs refer to a market more loosely defined as the "market for chiropractic services in North Carolina." (Am. Compl. ¶ 143;) *see also* (Am. Compl. ¶¶ 126, 146, 162(g);) (Opp. to Mot to Dismiss 5, 17. (referring to the trade restrained as "chiropractic care," and "practice of chiropractic in North Carolina") Third, Plaintiffs refer to a market of "in-network chiropractic care," presumably in North Carolina. (Opp to Mot. to Dismiss 3, 5–6, 7–8, 10, 23.)

{21} Plaintiffs are equally imprecise in alleging the allocation of power within their alleged market. For example, in the Amended Complaint, Plaintiffs

---

[5] The present case is a good example of the potential impact of differences in approach occasioned by the state Rule 12(b)(6) standard that adheres to *Sutton v. Duke*, and the more recent federal plausibility standard enunciated in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). For example, Plaintiffs have alleged that Defendants have set prices for chiropractic services so that the number of visits by a provider's patient population is the sole determinant of a provider's average cost per patient. (Opp. to Mot. to Dismiss 3.) The logic may be correct if there is a single fixed price for those services. But the same logical conclusion may not follow if a provider is free to lower her charge in order to achieve the low average cost per patient necessary to remain in the HNS Network. While the provider may have suffered an income loss, there may not have been injury to competition.

quantify HNS's market power as a "vast majority" of the relevant market, a "considerable majority" of the relevant market, a "large share" of the relevant market, and a "monopsony or monopoly" share of the market (Am. Compl. ¶¶ 125, 126, 143.) In their Opposition to Defendant's Motion to Dismiss, Plaintiffs are only slightly more specific, stating that HNS controls "substantially more than 50% of the market" by virtue of its relationship with Insurers, one of whom alone has "more than 50% of the relevant market." (Opp. to Mot. to Dismiss 3, 16.)

{22} There is also some lack of precision in the allegation of whether Defendants have control because their network is exclusive. (Am. Compl. ¶ 60.) For purposes of the present Motion, the court has accepted Plaintiffs' assertion that HNS has effective exclusivity even if the contracts do not expressly provide for such exclusivity. (Opp. to Mot. to Dismiss 2, 16–17.) The court has not yet accepted Defendants' invitation to rely instead on the absence of language in the underlying contracts representing any such exclusivity.

{23} The court will then convene a status conference and discovery will be held in abeyance until that conference. Subject to its consideration of further presentations by the Parties, the court is inclined to order that initial discovery and proceedings be limited to that necessary to greater define the "market" by which Plaintiffs' claims are to be measured. The court invites discussion on whether there is reasonable discovery on other claims that should not be delayed. The court further invites consideration of any approaches appropriate to better defining the market, such as, for example, whether to pursue a separate proceeding which may include evidentiary presentations and fact finding pursuant to Rule 42, or alternatively whether some procedure such as the use of a special master or a court-appointed expert would be appropriate. *See* David F. Herr, *Annotated Manual for Complex Litigation* (Fourth) at § 30.1 (West 2013) (supplement to Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure (1969-2013)).

{24} In advance of the status conference, the Parties should confer on these topics and be prepared to present joint or separate proposals for a further case management order. At a minimum, they should be prepared to propose a plan that

addresses: (1) what fact and expert discovery is necessary to define the "market"; (2) the nature and timing of further proceedings to determine the market that should define the resolution of claims; and (3) whether discovery on claims other than the competition claims should be held in abeyance pending efforts directed at the market definition.

## CONCLUSION

{25} For the foregoing reasons, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is DENIED without prejudice to reexamine Plaintiffs' claims upon a more developed factual record;

{26} The Parties are directed to coordinate with the court to schedule a status conference at a mutually convenient time on or after January 13, 2014;

{27} In addition to the matters for consideration the court has noted, the Parties may within five days of the status conference propose additional items that should be placed on an agenda for the status conference.

{28} Discovery shall be held in abeyance pending the status conference.

IT IS SO ORDERED, this the 5th day of December, 2013.